UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN RE: E. I. DU PONT DE
NEMOURS AND COMPANY C-8
PERSONAL INJURY LITIGATION,

Civil Action 2:13-md-2433
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth Preston Deavers

This document relates to:

*David Freeman v. E. I. du Pont de Nemours and Company*, Case No. 2:13-CV-1103

## MOTIONS *IN LIMINE* ORDER NO. 8

### Questioning of Plaintiff's Treating Physician on Causation

This matter is before the Court on Plaintiff David Freeman's Motion *in Limine* No. 17, To Preclude Defendant from Questioning Plaintiff's Treating Physician Kelli Anne Cawley, M.D., Regarding Causation (ECF No. 4433), and Defendant's Memorandum in Opposition to Plaintiff's Motion (ECF No. 4479). For the reasons that follow, the Court **GRANTS** Plaintiff's Motion in accordance with this Opinion and Order.

I.

Plaintiff David Freeman's trial is scheduled for May 31, 2016, as the second bellwether trial of the over 3500 cases that make up this multidistrict litigation ("MDL"). The Judicial Panel on Multidistrict Litigation describes the cases in its Transfer Order as follows:

> All the actions are personal injury or wrongful death actions arising out of plaintiffs' alleged ingestion of drinking water contaminated with a chemical, C-8 (also known as perfluorooctanoic acid (PFOA) or ammonium perfluorooctanoate (APFO)), discharged from DuPont's Washington Works Plant near Parkersburg, West Virginia. All of the plaintiffs in this litigation allege that they suffer or

suffered from one or more of six diseases identified as potentially linked to C-8 exposure [("Linked Diseases")]by a study conducted as part of a 2005 settlement ["*Leach* Settlement Agreement"] between [Defendant E. I. Du Pont de Nemours & Company ("DuPont")] and a class of approximately 80,000 persons residing in six water districts [("Leach Class")] allegedly contaminated by C-8 from the Washington Works Plant. *See Leach v. E. I. Du Pont de Nemours & Co.*, No. 01-C-608 (W. Va. Cir. Ct. [(Wood County Aug. 31, 2001), ("*Leach* Case")].

(Transfer Order at 1, ECF No. 1.) DuPont utilized C-8 as a manufacturing aid in the production of Teflon™.

In the *Leach* Settlement Agreement, the parties fashioned a unique procedure to determine whether the individual class members would be permitted to file actions against DuPont based on any of the human diseases they believed had been caused by their exposure to C-8. The procedure required DuPont and the plaintiffs to jointly select three completely independent, mutually-agreeable, appropriately credentialed epidemiologists ("Science Panel") to study human disease among the residents exposed to C-8 by the discharges from DuPont's Washington Works plant. (*Leach* Settlement Agreement "S.A." at §§ 12.2.1, 12.2.2; MDL ECF No. 820-8.)

The *Leach* Settlement Agreement provided that the conclusions of the Science Panel's study would be issued in either a "Probable Link Finding" or a "No Probable Link Finding" for each human disease the Panel studied. (S.A. § 12.2.3.) In 2011 and 2012, after a seven-year, twenty million dollar study, the Science Panel delivered Probable Link Findings for the six Linked Diseases, including testicular cancer, a disease from which Mr. Freeman suffered. The *Leach* Settlement Agreement permits the individual members of the *Leach* Class who allege they suffer or suffered from one or more Linked Diseases to pursue the claims "for personal injury and wrongful death, including but not limited to any claims for injunctive relief and special, general and punitive and any other damages whatsoever associated with such claims, that .

2

. . relate to exposure to C-8 of Class Members" and DuPont agreed not to contest general causation in those actions. (S.A. § 3.3.). DuPont retained the right to contest specific causation and to assert any other defenses not barred by the *Leach* Settlement Agreement. For a full background of the *Leach* Case, see Dispositive Motions Order No. 12. (ECF No. 4306.)

Mr. Freeman has lived in Cutler, Ohio, since 1993. The water to his residence was supplied from the Little Hocking water district, a named district in the *Leach* Settlement Agreement. DuPont does not dispute that Mr. Freeman is a member of the *Leach* Class.

In March 2000, when Mr. Freeman was forty years old, he felt pain in his right testis when he bumped it while taking a shower. Upon self-examination, he found what he described as a "hard testicle which turned out to have a mass inside." (Freeman Dep. at 224–25, ECF No. 4312-4.) After consulting his primary care physician, who referred him to a urologic surgeon, "he underwent a right radical orchiectomy (inguinal approach)," on April 5, 2000. (Bahnson Report at 3, ECF No. 4311-1.) Pathology revealed that his "right testicular tumor was a teratoma with both mature and immature elements: *i.e.*, a malignancy. Additionally, peripheral to the tumor were some seminiferous tabules demonstrating intratubular germ cell neoplasia of the unclassified type." *Id.* at 4. Oncologist Kelli Cawley, M.D., diagnosed Mr. Freeman "with cancer of the testis and, more specifically, teratoma with immature and mature components." *Id.* at 3–4. "After the surgical extraction of his right testis and teratoma, Mr. Freemans underwent a ten-year follow-up protocol which involved frequent observation via x-rays, CAT scans, and tumor markers." *Id.* at 4.

While Mr. Freeman is not required to prove that C-8 is capable of causing his testicular cancer, he is required to prove that C-8 caused his cancer. To meet his burden, Mr. Freeman has proffered the expert opinion of Robert Bahnson, M.D., F.A.C.S. Dr. Bahnson opined that:

3

> David Freeman's exposure to C-8 in his drinking water was a substantial contributing factor in bringing about the development of his testicular cancer. Further, his cancer in the right testis now puts him at substantial risk (approximately 15% chance) for developing cancer in the left testis. Additionally, because Mr. Freemam underwent (appropriately so) frequent repeated CT scanning as part of his 10 year observation protocol, his risk for developing other cancers has also increased.

*Id.* at 7. The Court found Dr. Bahnson's opinion admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Incorporated*, 509 U.S. 579 (1993). (Evidentiary Motions Order No. 4, ECF No. 4518.)

On May 6, 2016, the Court held oral argument on the parties' fifty-three motions *in limine*. (ECF No. 4527.) After reading the briefing and taking oral argument on the issue of questioning Mr. Freeman's treating physician, Dr. Cawley, the Court indicated that it would issue a written opinion on the issue.

## II.

Neither the Federal Rules of Evidence nor the Federal Rules of Civil Procedure explicitly authorize a court to rule on an evidentiary motion *in limine*. The United States Supreme Court has noted, however, that the practice of ruling on such motions "has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n. 4 (1984). The purpose of a motion *in limine* is to allow a court to rule on issues pertaining to evidence in advance of trial in order to avoid delay and ensure an evenhanded and expeditious trial. *See Ind. Ins. Co. v. Gen. Elec. Co.,* 326 F. Supp.2d 844, 846 (N.D. Ohio 2004) (citing *Jonasson v. Lutheran Child & Family Servs.,* 115 F.3d 436, 440 (7th Cir. 1997)). Notwithstanding this well-meaning purpose, courts are generally reluctant to grant broad exclusions of evidence *in limine*, because "a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Koch v. Koch Indus., Inc.,* 2 F. Supp.2d

4

1385, 1388 (D. Kan.1998); *accord Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir. 1975).

To obtain the exclusion of evidence under such a motion, a party must prove that the evidence is clearly inadmissible on all potential grounds. *See Ind. Ins. Co.,* 326 F.Supp.2d at 846; *Koch,* 2 F. Supp.2d at 1388; *cf. Luce,* 469 U.S. at 41. "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context." *Ind. Ins. Co.,* 326 F. Supp.2d at 846.

Mr. Freeman argues that the evidence at issue should be excluded under Rules 401, 402 of the Federal Rules of Evidence and/or Federal Evidence Rule 403. Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Evidence Rule 402 provides that "[e]vidence which is not relevant is not admissible."

Even if evidence is relevant under the standards set forth by Evidence 401, the Court may still exclude the evidence. Federal Rule of Evidence 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Mr. Freeman moves for exclusion under this Rule as well.

### III.

Mr. Freeman requests that the Court prohibit DuPont "from introducing any evidence, testimony, or argument of counsel as to the opinions, or lack thereof, of Mr. Freeman's treating

5

physician, Kelli A. Cawley, M.D.," on any cause of Mr. Freeman's testicular cancer. DuPont responds that it is properly "eliciting relevant and probative fact testimony from his treating oncologist, [Dr. Cawley], regarding her care and treatment of him." (Def.'s Mem. in Opp. at 1.) The following testimony is relevant to the Court's consideration of this issue.

> Q [from counsel for DuPont]: All right. And just because -- even if you've had testis cancer and you had one of those risk factors,[1] it doesn't necessarily mean that one of those risk factors caused the testis cancer?
>
> A: I don't have an opinion of that.
>
> Q: Would it be fair to say that in most cases the specific cause of an individual's testis cancer is never known?
>
> A: Repeat that. I'm just writing down what you said.
>
> Q: Can -- well, can we agree that in most cases the specific cause of an individual's testis cancer is never known?
>
> A: I don't have an opinion of that because I'm a treating oncologist. I'm not an epidemiologist or geneticist.
>
> . . . .
>
> Q: And so just so we're clear about Mr. Freeman, you didn't make any determination of what caused his testis cancer?
>
> A: No.
>
> Q: And sitting here today, you don't – so you do not know what caused his testis cancer?
>
> A: I do not have an opinion of what caused his – [cancer.]

---

[1] Dr. Cawley testified that she has no knowledge of the Science Panel's work or its determination that it is more likely than not there is link between exposure to C-8 and testicular cancer in a defined group of individuals of which Mr. Freeman is a member. (Cawley Dep. at 11, 98–100); (S.A. § 1.49) ("'Probable Link' shall mean that based upon the weight of the available scientific evidence, it is more likely than not that there is a link between exposure to C-8 and a [Linked] Disease among Class Members."). Thus, when asked about the known risk factors, if any, of testicular cancer, Dr. Cawley mentioned only family history, undescended testes, exposure to high doses of estrogen in the mother, and HIV. *Id.* at 21.

(Cawley Dep. at 21–22, 29, 98–100, ECF No. 4312-3) (objections omitted).

Mr. Freeman's counsel followed up the above questioning:

Q: I'm sorry. Do you want to extrapolate any further?

A: So -- and again, I think I presented earlier that I'm a treating oncologist. So I'm not a scientist. And so my expertise is not knowing the causes of cancer, it's the treating of cancer.

Q: Okay. So would it be fair to say that it's not part of your routine practice to determine the causes of your patients' cancer?

A: I do not determine the cause of my patients' cancer.

Q: So you're not an epidemiologist?

A: No, I'm not an epidemiologist.

Q: You also testified that you had – and correct me if I mischaracterize any of your testimony, but I believe you said you had no opinion as to the cause of Mr. Freeman's testicular cancer. Do you recall that testimony?

A: I don't have the opinion because I don't have the education or the training to determine the causes of Mr. Freeman's cancer.

Q: Okay. So would it be fair that you have no opinion because determining the cause of testicular cancer is outside the scope of your expertise –

A: Yes, determining the cause of cancer is -- of testicular cancer or any cancer is outside the scope of my practice.

*Id.* at 104–06.

DuPont argues that it is relevant to the determination of specific causation that Dr. Cawley failed to attribute a cause to Mr. Freeman's testicular cancer:

Dr. Cawley's fact testimony, as Plaintiff's treating oncologist, that she did not determine a cause of his testicular cancer is directly relevant to the jury's consideration of specific causation. Among other things, it will clarify that his treating physician did not determine a cause, which will guard against a juror speculating or assuming that his treating physician made a determination that C8 caused his cancer.

. . . .

7

> The fact that Plaintiff's own treating physician did not recognize his testicular cancer as being atypical also is directly probative of whether it is possible to distinguish Plaintiff's case of testicular cancer from any other case of testicular cancer that routinely occurs in patients all over the United States, and not caused by C-8. Dr. Cawley's fact testimony that she typically does not determine a cause for her patients with testicular cancer also supports DuPont's position that the cause of testicular cancer is unknown in the majority of patients.

(Def.'s Mem. in Opp. at 2.) DuPont's arguments are not well taken.

First, Dr. Cawley's fact testimony "that she did <u>not</u> determine a cause of his testicular cancer is directly relevant to the jury's consideration of specific causation" only if (1) she were qualified to make a causation determination, and (2) in Mr. Freeman's particular case she was *unable* to make a causation determination. But Dr. Cawley unambiguously testified that she did not determine a cause of Mr. Freemen's testicular cancer "because [she doesn't] have the education or the training to determine the causes of Mr. Freeman's cancer. . . . [She is] a treating oncologist. . . . not a scientist. . . . And so [her] expertise is not knowing the causes of cancer, it's the treating of cancer." (Cawley Dep., *supra*.) What DuPont is actually doing is asking the jury to draw an inference that Dr. Cawley *could* make a determination *and she did not* do so here. There is no support in the record for this type of inference, and thus it is not probative.

Second, the Court disagrees with DuPont's framing of Dr. Cawley's assessment. That is, DuPont states that Dr. Cawley failed to recognize Mr. Freeman's cancer "as being atypical." Dr. Cawley, however, made no determination of the cause of Mr. Freeman's cancer – not because she was unable "to distinguish Plaintiff's case of testicular cancer from any other case of testicular cancer that routinely occurs in patients all over the United States, and not caused by C8." But rather, she simply "do[es] not determine the cause of [her] patients' cancer. . . . [because] determining the cause of cancer is -- of testicular cancer or any cancer is outside the scope of [her] practice. . . ." (Cawley Dep., *supra*.)

8

Third, DuPont's "position that the cause of testicular cancer is unknown in the majority of patients" is not supported by "Dr. Cawley's fact testimony that she typically does not determine a cause for her patients with testicular cancer." Dr. Cawley's testimony could only support DuPont's position that the cause of testicular cancer is unknown in the majority of patients if Dr. Cawley "typically does not determine a cause for her patients with testicular cancer" because the cause is unknown in the majority of cases. However, Dr. Cawley does not determine the cause for testicular cancer in her patients because she is unqualified to do so—not because the cause is unknown in the majority of cases. Additionally, the Court notes that Mr. Freeman's specific causation expert does not dispute that the cause of testicular cancer is unknown in the majority of cases.

Fourth, the Court disagrees with DuPont's suggestion that the jury will speculate or assume that Dr. Cawley made a determination that C-8 caused Mr. Freeman's cancer unless DuPont clarifies with the causation testimony it attempts to elicit. Even if there was room for speculation, DuPont's concern is easily remedied. DuPont may ask Dr. Cawley whether in her practice she diagnoses cancer *and the cause* of the cancer. Assuming that Dr. Cawley answers no, that she is not qualified to determine the cause of cancer, the jurors will have no need to speculate or assume that she made a determination that C-8 caused Mr. Freeman's testicular cancer—or that she made any causation determination at all.

None of the cases cited by DuPont changes this analysis. DuPont is correct that "[a] treating physician may testify as a fact witness as to his or her first-hand treatment and care of the patient. *See e.g., United States v. Wells*, 211 F.3d 988, 998 (6th Cir. 2000) (holding that the trial court did not abuse its discretion in permitting treating physicians to testify regarding first-hand observations and treatment of patient)." DuPont may question Dr. Cawley as to her first-

9

hand treatment and care of Mr. Freeman. But, DuPont also seeks to question Dr. Cawley as to the cause of Mr. Freeman's testicular cancer, which is something altogether different.

Indeed, in contrast to Dr. Cawley, who has no knowledge, expertise, or opinion about causation, all of the cases upon which DuPont relies relate to non-expert treating physicians who testified about a topic with which they had knowledge, expertise, and an opinion. For example, in *Wells*, *supra*, the court permitted the treating physician to testify as to his opinion that the plaintiff was cancer-free. *Id.* The doctor formed this opinion during his first-hand treatment and care of the patient. Similarly, in *Buccina v. Grimsby*, No. 3:14CV2434, 2016 U.S. Dist. LEXIS 7213, at *1–2 (N.D. Ohio Jan. 21, 2016), the court permitted the treating physicians to testify as to their opinions that the plaintiff did not require any further treatment – opinions they formed during their first-hand treatment and care of the patient. Likewise, in *Tompkin v. Am. Tobacco, Co.*, No. 5:94 CV 1302, 2001 U.S. Dist. LEXIS 26280, at *6 (N.D. Ohio July 25, 2001), the court denied a motion *in limine* to preclude a treating physician from testifying as to an opinion he held regarding the cause of the plaintiff's illness. And, finally, in *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 269 (6th Cir. 2001), the treating physician was permitted to testify to an opinion he formed based on his experience in finding what "caused his patients to contract" the diseases at issue.

Dr. Cawley has not been proffered as an expert witness on specific causation, and by her own unequivocal and unchallenged testimony, holds no opinion as to specific causation, and is unqualified to render any such opinion. Consequently, for the reasons just explained, DuPont may not attempt to develop any testimony through Dr. Cawley related to specific causation, as well as commenting on Dr. Cawley's lack of or inability to form a specific causation opinion. To be clear, DuPont is free to elicit testimony that (1) Dr. Cawley did not address and does not

10

have an opinion as to the cause of Mr. Freemen's testicular cancer, so long as (2) the witness is contemporaneously asked if she ever opines on causation and if she is qualified to do so.

The Court also finds that even if Dr. Cawley's opinion were somehow relevant, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading of the jury, and would cause undue delay and/or needless presentation of cumulative evidence. Asking the jury to draw an inference that Dr. Cawley *could* make a determination *and she did not* do so here constitutes a real danger of unfair prejudice to Mr. Freeman. There is simply no evidence in the record to support such an inference, which in effect is misleading to the jury. Further, both parties offer causation experts, all of whom are qualified to render causation opinions. Therefore, Dr. Cawley's testimony regarding causation could confuse the triable issues and add nothing of probative value.

### IV.

Based on the foregoing, the Court **GRANTS** Mr. Freeman's Motion *in Limine* No. 17, To Preclude DuPont from Questioning Plaintiff's Treating Physician Kelli Anne Cawley, M.D., Regarding Causation. (ECF No. 4433.)

**IT IS SO ORDERED.**

5-19-2016
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**

11