# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: E. I. DU PONT DE NEMOURS AND COMPANY C8 PERSONAL INJURY LITIGATION | : : : | CASE NO. 2:13-MD-2433 |
| | : | JUDGE EDMUND A. SARGUS, JR. |
| **This document relates to:** | : : | |
| ***Freeman v. E. I. du Pont de Nemours and Company***, Case No. 2:13-CV-1103 | : : | MAGISTRATE JUDGE ELIZABETH P. DEAVERS |

**DUPONT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, FOR A NEW TRIAL AND REMITTITUR ON PLAINTIFF DAVID FREEMAN'S CLAIMS AND INCORPORATED MEMORANDUM OF LAW**

Pierre H. Bergeron (0071402)
SQUIRE PATTON BOGGS (US) LLP
221 E. Fourth Street
Suite 2900
Cincinnati, Ohio 45202
(513) 361-1200 (Phone)
(513) 361-1201 (Fax)

Damond R. Mace (0017102) (Trial Attorney)
Stephen M. Fazio (0076873)
Stephanie E. Niehaus (0075511)
SQUIRE PATTON BOGGS (US) LLP
4900 Key Tower
127 Public Square
Cleveland, Ohio 44114
(216) 479-8500 (Phone)
(216) 479-8780 (Fax)

C. Craig Woods (0010732)
Aaron T. Brogdon (0081858)
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700 (Phone)
(614) 365-2499 (Fax)

*Attorneys for Defendant E. I. du Pont de Nemours and Company*

## SUMMARY OF POINTS AND AUTHORITIES

Pursuant to Local Rule 7.2, DuPont submits the following summary of points and authorities cited:

**INTRODUCTION**................................................................................................ 1

Fed. R. Civ. P. 50(b) .......................................................................................... 1

Fed. R. Civ. P. 59(a) ....................................................................................... 1-2

**ARGUMENT** ..................................................................................................... 3

**I.    DUPONT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON MR. FREEMAN'S CLAIM FOR NEGLIGENCE** ....................................... 4

*Judgment as a matter of law is warranted here because there was no legally sufficient evidentiary basis for the jury to find for Mr. Freeman.*

Fed. R. Civ. P. 50(a) .......................................................................................... 4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................... 4

*Aparicio v. Norfolk & W. Ry.*, 84 F.3d 803 (6th Cir. 1996)............................. 4

*Denhof v. City of Grand Rapids*, 494 F.3d 534 (6th Cir. 2007)....................... 4

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)................... 4

**A.    Mr. Freeman Cannot Recover "Cancerphobia" Damages** ............................. 5

*Mr. Freeman presented no scientific basis for any apprehension of cancer, which means his fear is not reasonable as a matter of law, nor did he present evidence that he suffered from any phobia.*

*Sanjuan v. IBP, Inc.*, 160 F.3d 1291 (10th Cir. 1998) .................................... 4

*White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789 (6th Cir. 2004)........... 4

Fed. R. Civ. P. 50................................................................................................ 4

*Lavelle v. Owens-Corning Fiberglas Corp.*, 30 Ohio Misc. 2d 11 (Cuyahoga Cty. Com. Pl. 1987) .................................................................... 5, 8

*Slane v. MetaMateria Partners, L.L.C.*, 892 N.E.2d 498 (Ohio Ct. App. 2008) ........................... 5

*Becker v. Montgomery*, 43 Fed. App'x 914 (6th Cir. 2002) ........................... 8

*Cantrell v. GAF Corp.*, 999 F.2d 1007 (6th Cir. 1993) .............................. 7-8

**SUMMARY OF POINTS AND AUTHORITIES**
(continued)

Page

*Thornton v. Vonage Tel. Servs.*, 2011 U.S. Dist. LEXIS 19383 (N.D. Ohio Feb. 28, 2011) ........................................................................................................ 7

*Perry v. Dept. of Rehab. and Corr.*, 2013 Ohio App. LEXIS 3992 (Ohio Ct. App. Sept. 5, 2013) ...................................................................................................... 8

      B.      **Mr. Freeman's Negligence Claim Fails as a Matter of Law** ........................... 9

              *The existence of a duty derives from the foreseeability of the injury, which depends on DuPont's knowledge.*

*Chambers v. St. Mary's School*, 697 N.E.2d 198 (Ohio 1998) ...................................... 9

         1.      Plaintiff Did Not Establish that DuPont Knew or Should Have Known Harm to Humans Was Likely at Community Levels of Exposure to C8 ....................................................................................... 9

              *Plaintiff did not prove it was foreseeable to DuPont that C8 was likely to cause human harm at community exposure levels.*

*Menifee v. Ohio Welding Prods., Inc.*, 472 N.E.2d 707 (Ohio 1984) ......................... 10

         2.      Plaintiff Did Not Prove that DuPont Failed to Use the Care that a Reasonable Corporation Would Have Under Similar Circumstances ............................................................................................ 12

              *Mr. Freeman failed to present evidence that DuPont violated any legal standard of care, giving no testimony about what a reasonable corporation would have done, focusing instead on purported ethical and moral standards.*

*In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164 (N.D. Ohio Aug. 8, 2005) ...................................................................................................... 13

*Estates of Morgan v. Fairfield Family Counseling Ctr.*, 673 N.E.2d 1311 (Ohio 1997) ........................................................................................................ 13

*In re Welding Fume Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 146067 (N.D. Ohio June 4, 2010) .................................................................................... 13

         3.      Plaintiff Presented No Evidence that C8 More Likely than Not Specifically Caused His Testicular Cancer, and Instead Presented Evidence Confirming the Idiopathic Nature of Testicular Cancer ......... 16

              *Mr. Freeman's only expert on specific causation, Dr. Bahnson, gave speculative testimony that was insufficient to support a verdict because he*

**SUMMARY OF POINTS AND AUTHORITIES**
(continued)

**Page**

*did not – and could not – meaningfully exclude testicular cancer's idiopathic nature.*

*Anderson v. St. Francis-St. George Hosp.*, 671 N.E.2d 225 (Ohio 1996) .................................. 16

*Bland v. Verizon Wireless, L.L.C.*, 538 F.3d 893 (8th Cir. 2008)................................. 16

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010) ........................................ 16

*Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244 (6th Cir. 2001) ......................................... 17, 19

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010) ........................................ 17

*Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171 (6th Cir. 2009).............................. 19

*Henricken v. Conoco Phillips Co.*, 605 F. Supp. 2d 1142 (E.D. Wash. 2009) ......................... 19

        4.      Plaintiff Cannot Prove DuPont's Negligence With Conduct Occurring After His Injury.................................................................................... 20

*Much of Mr. Freeman's liability case was dedicated to post-2000 evidence, which was not relevant to the issue, but instead was unfairly prejudicial to DuPont.*

*Krumpelbeck v. Breg, Inc.*, 759 F. Supp. 2d 958 (S.D. Ohio 2010) ............................................ 21

*Toole v. McClintock*, 999 F.2d 1430 (11th Cir. 1993) ................................................. 21

*Gulbranson v. Duluth, Missabe & Iron Range Ry. Co.*, 921 F.2d 139 (8th Cir. 1990) ............................................................................................................................. 21

*LeBoeuf v. K-Mart Corp.*, 888 F.2d 330 (5th Cir. 1989) ............................................. 21

  **C.**    **The Punitive Damages Award Was Improper As A Matter Of Law Because Plaintiff Failed To Prove That DuPont Acted With Actual Malice Or That DuPont's Conduct Was Reprehensible** ............................... 22

*Mr. Freeman failed to meet his burden of proving DuPont acted with actual malice or that it consciously disregarded evidence of a great probability that C8 exposure at community exposure levels would cause human harm.*

*Kuebler v. Gemini Transp.*, 2013 U.S. Dist. LEXIS 172769 (S.D. Ohio Dec. 9, 2013) ...................................................................................................................... 23, 25

*McCombs v. Meijer, Inc.*, 395 F.3d 346 (6th Cir. 2005)............................................. 22

**SUMMARY OF POINTS AND AUTHORITIES**
(continued)

Page

*McCurdy v. Montgomery County*, 240 F.3d 512 (6th Cir. 2001)................................ 22

*Preston v. Murty*, 512 N.E.2d 1174 (Ohio 1987)....................................... 22

*Ross v. Home Depot USA Inc*., 2014 U.S. Dist. LEXIS 133507 (S.D. Ohio Sept. 23, 2014) ...................................................................................... 23

*Terek v. Finkbiner*, 2015 U.S. Dist. LEXIS 124939 (N.D. Ohio Sept. 18, 2015) ..................... 23

Ohio Rev. Code § 2315.21(C) ............................................................. 22

*Preston v. Murty*, 512 N.E.2d 1174 (Ohio 1987)...................................... 22, 25

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ............................ 25

*BMW of N. Am. v. Gore*, 517 U.S. 559 (1996)............................................. 26

*Clark v. Chrysler Corp*., 436 F.3d 594 (6th Cir. 2006) ................................... 26

*In re Miamisburg Train Derailment Litig*., 725 N.E.2d 738 (Ohio Ct. App. 1999)................. 26

*Bains LLC v. ARCO Prods. Co*., 220 F. Supp. 2d 1193 (W.D. Wash. 2002)......................... 28

*Exxon Valdez v. Exxon Mobile Corp*., 490 F.3d 1066 (9th Cir. 2007) ......................27-29

**II.    THE COURT SHOULD GRANT A NEW TRIAL FOR NUMEROUS REASONS**.................................................................................. 30

*A new trial should be ordered where the verdict is against the weight of the evidence, the damages are excessive, or the trial was not fair to the party moving.*

*Mike's Train House, Inc. v. Lionel LLC*, 472 F.3d 398 (6th Cir. 2006) ...................... 30

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940) ..................................... 30

*Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791 (6th Cir. 2007) ...................... 30

**A.    The Court's Erroneous Interpretation of the Leach Agreement Constitutes a Threshold Error that Pervasively Affected the Trial**............. 30

*Mr. Freeman was improperly allowed to mischaracterize the Probable Link finding and DuPont's concession of general causation, and was improperly allowed to use the "standard" to argue that it established specific causation.*

*Terry v. Caputo*, 875 N.E.2d 72 (Ohio 2007) ............................................. 31

-iv-

**SUMMARY OF POINTS AND AUTHORITIES**

(continued)

**Page**

*Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671 (6th Cir. 2011)....................................................... 32

    **B.**    **Improper Expert Testimony From Dr. Siegel and Mr. Petty Unfairly Prejudiced DuPont And Requires A New Trial** ............................................... 34

            *The expert testimony was highly prejudicial and repeatedly emphasized extra-legal standards of care that had no bearing on the questions before the jury.*

*Menifee v. Ohio Welding Prods., Inc.*, 472 N.E.2d 707 (Ohio 1984).......................................... 34

*Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994) ................................................................ 34

*Torres v. County of Oakland*, 758 F.2d 147 (6th Cir. 1985)........................................................ 34

*United States v. Barile*, 286 F.3d 749 (4th Cir. 2002) ................................................................ 35

*Woods v. Lecureux*, 110 F.3d 1215 (6th Cir. 1997)..................................................................... 34

*In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164 (N.D. Ohio Aug. 8, 2005) ............................................................................................................................. 36

*In re Welding Fume Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 146067 (N.D. Ohio June 4, 2010)........................................................................................................................... 35

    **C.**    **The Expert Testimony Introduced and Excluded at Trial Necessitates a New Trial** ........................................................................................................... 36

            *The testimony presented by Mr. Freeman's experts regarding differential diagnosis, the idiopathic nature of testicular cancer, and causation violates Daubert, and, in addition, DuPont's experts were improperly excluded.*

*In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164 (N.D. Ohio Aug. 8, 2005) ............................................................................................................................. 36

    **D.**    **Plaintiff's Repeated Assertion and Ultimate Withdrawal of His C8 Based Cancerphobia Theory Unduly Prejudiced DuPont By Allowing Introduction of Irrelevant and Unrebutted Evidence and Argument** ......... 37

            *Allowing Mr. Freeman to offer shifting and inconsistent factual bases for his cancerphobia damages theory was highly prejudicial to DuPont.*

    **E.**    **The Court's Bifurcation Ruling and Malice Interrogatory Opened the Door to the Jury's Confused and Unsupported Damages Award** ................. 40

**SUMMARY OF POINTS AND AUTHORITIES**
(continued)

**Page**

*The Court's bifurcation ruling allowed Plaintiff to introduce extensive evidence unrelated to compensatory liability and invited the jury to make a finding of malice without the proper context.*

*Benson v. Facemyer*, 2015 WL 5737340 (N.D. Ga. Sept. 30, 2015) .......................... 43

*James v. Ruiz*, 111 A.3d 123 (N.J. Super. Ct., App. Div. 2015) ................................... 43

*Pennington v. Sears, Roebuck & Co.*, 878 P.2d 152 (Colo. App. 1994) ..................... 44

*United States v. Reyes*, 18 F.3d 65 (2d Cir. 1994) ...................................................... 44

*Chism v. CNH Am. LLC*, 2009 WL 890523 (E.D. Ark. Mar. 30, 2009) ..................... 45

*Rotello v. Clayton Homes of Del., Inc.*, 2006 WL 842931 (E.D. Tenn. Mar. 28, 2006) ............................................................................................................................ 45

    **F.**    **The Court Issued Improper Instructions on Causation and Cancerphobia** ................................................................................................. 45

*The Court's jury instructions on causation and cancerphobia misstated and misapplied the relevant law.*

*O-So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498 (6th Cir. 1992) ........................... 46

*Cantrell v. GAF Corp.*, 999 F.2d 1007 (6th Cir. 1993) ............................................... 47

*Hagerty v. L & L Marine Servs., Inc.*, 788 F.2d 315 (5th Cir. 1986) ......................... 47

*Lavelle v. Owens-Corning Fiberglas Corp.*, 30 Ohio Misc. 2d 11 (Cuyahoga Cty. Com. Pl. 1987) ........................................................................................................... 47

    **G.**    **A New Trial Is Warranted Due to A Host Of Evidentiary Issues** ................ 48

*A number of additional errors on important evidentiary issues created an unfair playing field at trial.*

Fed. R. Evid. 602 ......................................................................................................... 48

*Fambrough v. Wal-Mart Stores, Inc.*, 2015 U.S. App. LEXIS 7888 (6th Cir. May 11, 2015) ................................................................................................................... 48

Fed. R. Evid. 611(b) ..................................................................................................... 50

**SUMMARY OF POINTS AND AUTHORITIES**
(continued)

Page

*Korn, Womack, Stern & Assocs. v. Fireman's Fund Ins. Co.*, 1994 U.S. App.
LEXIS 15022 (6th Cir. June 15, 1994) ................................................................... 51

*McLeod v. Parsons Corp.*, 73 Fed. App'x 846 (6th Cir. 2003) ................................... 50

*N.J. Turnpike Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460 (D.N.J. 1998) .............. 51

*Sadler v. Advanced Bionics, LLC*, 2013 U.S. Dist. LEXIS 46637 (W.D. Ky. Apr.
1, 2013) .................................................................................................................... 50

*Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921 (6th
Cir. 1999) ................................................................................................................. 51

*Mitroff v. Xomox Corp.*, 797 F.2d 271 (6th Cir. 1986) ............................................. 51

*In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164 (N.D. Ohio
Aug. 8, 2005) ........................................................................................................... 52

**H.      The Cumulative Effect of These Errors Warrants a New Trial** ................... 54

*Each error was significant enough to prevent a fair trial and at a minimum their
cumulative effect warrants a new trial.*

*Beck v. Haik*, 377 F.3d 624 (6th Cir. 2004) .............................................................. 54

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940) ....................................... 54

*Adkins v. Wolever*, 554 F.3d 640 (6th Cir. 2009) ...................................................... 54

*Penn, LLC v. Prosper Bus. Dev. Corp.*, 600 Fed. App'x 393 (6th Cir. 2015) ............. 54

*Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457 (9th Cir. 2014) (en banc) ..... 54

*Schrand v. Federal Pacific Electric Co.*, 851 F.2d 152 (6th Cir. 1988) ..................... 54

**III.    IN THE ALTERNATIVE, THIS COURT SHOULD SIGNIFICANTLY
REDUCE THE AMOUNT OF COMPENSATORY DAMAGES AND
VACATE OR REDUCE THE AWARD OF PUNITIVE DAMAGES** ................... 55

*The jury award far exceeds amounts awarded in similar cases and the caps set on the
amount of noneconomic compensatory damages per Ohio's Tort Reform Act.*

**A.      The Verdict Was Excessive Because Mr. Freeman's Evidence Did Not
Support An Award Of $5.1 Million In Compensatory Damages** ................. 55

## SUMMARY OF POINTS AND AUTHORITIES
### (continued)

**Page**

*The $5.1 million compensatory damage award is grossly disproportionate both to the harm Mr. Freeman sustained and to awards in similar cases.*

*Hartzler v. Licking County Humane Soc.*, 740 F. Supp. 470 (S.D. Ohio 1990) ........................ 55

*Carey v. Piphus*, 435 U.S. 247 (1978) ........................................................................... 55

*Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768 (3d Cir. 1987) ............................................... 55

*Rogers v. Fischer Body Div.*, 739 F.2d 1102 (6th Cir. 1984) ........................................ 55

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988) ............................... 55

*Cooley v. Lincoln Elec. Co.*, 776 F. Supp. 2d 511 (N.D. Ohio 2011) ........................... 56

*Stewart v. Zone Cab of Cleveland*, 2003 Ohio 4067 (Ohio Ct. App. July 31, 2003) ................. 57

*Battaglia v. Conrail*, 2009 Ohio 5505 (Ohio Ct. App. Oct. 16, 2009) ........................ 57

*Jackson v. A-C Prod. Liab. Trust*, 622 F. Supp. 2d 641 (N.D. Ohio 2009) ................... 57

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988) ......................... 55-57

**B.**  **This Court Should Reduce The Jury's Award Of Compensatory Damages To Comply With The Ohio Tort Reform Statute** ........................ 58

*Because Mr. Freeman did not assert any economic losses, this Court should reduce his award of compensatory damages to $250,000.*

*Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415 (1996) ................................. 58

*Mengelkamp v. Lake Metro. Hous. Auth.*, 549 Fed. App'x 323 (6th Cir. 2013) ......... 58

Ohio Rev. Code § 2315.18(B)(2) ................................................................................. 58

*Browning v. Burt*, 613 N.E.2d 993 (Ohio 1993) ........................................................ 60

*Chesher v. Neyer*, 477 F.3d 784 (6th Cir. 2007) ...................................................... 59

*Digital & Analog Design Corp. v. N. Supply Co.*, 590 N.E.2d 737 (Ohio 1992) ......... 59

*Norgard v. Brush Wellman*, 766 N.E.2d 977 (Ohio 2002) ........................................ 59

*Ross v. Farmers Ins. Group of Cos.*, 1997 Ohio App. LEXIS 30 (Ohio Ct. App. Jan. 10, 1997) ................................................................................................. 59

**SUMMARY OF POINTS AND AUTHORITIES**
(continued)

**Page**

*Thorton v. Montville Plastics & Rubber, Inc.*, 902 N.E.2d 482 (Ohio 2009) ............................. 59

*Treese v. City of Delaware*, 642 N.E.2d 1147 (Ohio Ct. App. 1994) ........................................ 59

Ohio Consumer Law § 17.03 ..................................................................................... 60

    **C.**    **Punitive Damages Were Duplicative And Excessive In Light of the Compensatory Award For Emotional Distress** .............................................. 61

        *Under controlling precedent, a large compensatory damages award that includes damages for emotional distress strongly suggests that the award is duplicative.*

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) ....................................... 61-62

*Bach v. First Union Nat'l Bank* ............................................................................... 62

**CONCLUSION** ................................................................................................. 63

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 50(b) and Fed. R. Civ. P. 59(a), Defendant E. I. du Pont de Nemours and Company ("DuPont") moves for judgment as a matter of law or alternatively for a new trial and/or remittitur on Plaintiff David Freeman's negligence claim. Judgment as a matter of law is particularly appropriate on the cancerphobia theory. There was insufficient evidence that Mr. Freeman had an increased statistical likelihood of developing cancer, as Dr. Bahnson admitted that he could not quantify the future risk of cancer and that no patients of his in Mr. Freeman's situation had ever redeveloped cancer. A cancerphobia claim cannot be premised on an unquantifiable risk so negligible that Mr. Freeman's treating physicians never mentioned it and which Mr. Freeman has not even bothered to be screened for over the past six years. Nor can a plaintiff sue for a cancerphobia based on a fear that arose during trial preparation (or at trial). Mr. Freeman's claim is unreasonable as a matter of law.

This Court should also grant judgment as a matter of law on Mr. Freeman's negligence claim because there was no proof that it was foreseeable to DuPont that C8 could cause human harm *at community exposure levels*. Expert testimony that there were signs that C8 was carcinogenic from animal studies (or even humans) at far higher exposure levels cannot suffice because the dose makes the poison—anything can be hazardous at a high enough level. Nor did Mr. Freeman present evidence of what a reasonable company would do in those circumstances, as both Dr. Siegel and Mr. Petty disavowed looking into what other companies were doing with C8, relying solely on their own subjective feelings for what was reasonable.

More importantly, Dr. Bahnson relied entirely on speculation to try to distinguish between the vast majority of testicular cancers that result from unknown causes (*i.e.*, "idiopathic" testicular cancer) and C8-caused testicular cancer. He performed no test that could tell the difference between the two and acknowledged that there is no such test—and therefore had no

1

basis other than the mere fact of Mr. Freeman's C8 exposure for his conclusions.  In other words, even if only 1 out of 1,000 testicular cancers in men exposed to C8 were statistically caused by C8, *Dr. Bahnson would still testify that C8 caused each individual cancer*.  Such testimony should not survive *Daubert* scrutiny and is insufficient to support the verdict.  Other reasons to grant DuPont's motion for judgment as a matter of law, including on the punitive damages award, are discussed below.

In the alternative, this Court should grant a new trial pursuant to Fed. R. Civ. P. 59(a). This Court is already familiar with DuPont's position on the interpretation and application of the *Leach* Agreement and on expert testimony about the purported public health "duty of care."   In addition, allowing Mr. Freeman to offer shifting and inconsistent bases for his cancerphobia theory and damages also confused the jury—and sent an unmistakable message that a viable cancerphobia claim can be cut from whole cloth, and subject only to the limits of Plaintiff's imagination.  As with the public health "duty of care" testimony, the vast amounts of irrelevant and unfairly prejudicial evidence on cancerphobia overwhelmed the limiting instructions, which came nowhere close to dampening the profoundly unfair prejudice to DuPont.  This confusion grew even worse by virtue of this Court's bifurcation ruling, which allowed Mr. Freeman to rely on punitive-damages evidence for compensatory liability and encouraged the jury to make a finding of malice without the proper context.  The jury demonstrably believed that it could take evidence relevant only to punitive damages into account in making its compensatory award— artificially inflating that award beyond all bounds of reasonableness and creating more unfair prejudice to DuPont.  As discussed below, there were also a host of other prejudicial evidentiary decisions, which together deprived DuPont of a fair trial.

But even if this Court does not grant a new trial, it should order remittitur because the $5.1 million compensatory damage award was excessive. Mr. Freeman had relatively little pain during the short period around the removal of the cancer and no permanent suffering or injury. His examining physicians found him "healthy and not in any physical or emotional distress," and he confirmed at trial that he has no lasting impairment as a result of his cancer or surgery. These facts cannot support $5.1 million in compensatory damages—nor are there any similar Ohio cases that have awarded such a large amount for a comparative claim. Even the highest awards for pain and suffering that accompany permanent, terrible injuries or death in toxic tort cases in Ohio seldom approach even two or three million dollars. In addition, this Court should apply Ohio's Tort Reform Statute to reduce the compensatory damages to $250,000 and vacate the punitive damage award. These issues, individually and cumulatively, warrant remittitur or a new trial.

DuPont understands that the Court has previously considered many of the arguments it advances below, and DuPont's prior briefing and arguments during trial and summary judgment, *Daubert* and motions in *limine* are incorporated here by reference. But DuPont respectfully urges the Court to take a fresh look at these matters from a post-trial vantage point. A new trial is warranted, free from the numerous errors discussed below, particularly given the importance of these bellwether trials in the context of the broader MDL. Correcting these errors at the outset of the bellwether process will prevent the parties and the Court from investing substantial resources in further proceedings that would need to be re-done if these errors are allowed to stand here but are later reversed on appeal.

## ARGUMENT

I.   **DuPont is Entitled to Judgment as a Matter of Law on Mr. Freeman's Claim for Negligence**

Under Rule 50(a), if a court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the plaintiff on an issue, the court may:  (a) resolve the issue against the party; and (b) grant a motion for judgment as a matter of law on any claim that is dependent upon that issue.  *See* Fed. R. Civ. P. 50(a)(1).  The inquiry for resolving a Rule 50 motion for judgment as a matter of law is the same as the Rule 56 inquiry for resolving a motion for summary judgment.  *White v. Burlington N. & Santa Fe Ry.*, 364 F.3d 789, 794 (6th Cir. 2004); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  Judgment as a matter of law is appropriate where "there can be but one reasonable conclusion as to the verdict," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986), because "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007).

This Court should "disregard any jury determination for which there is no legally sufficient evidentiary basis enabling a reasonable jury to make it."  Fed. R. Civ. P. 50(b) advisory committee's note.  The Court may then decide such issues as a matter of law and enter judgment.  *See id.*  As a threshold matter, the Court must determine "whether there is sufficient evidence to permit reasonable jurors to find for the non-moving party."  *Aparicio v. Norfolk & W. Ry.*, 84 F.3d 803, 807 (6th Cir. 1996); *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998) ("A mere scintilla of evidence is not sufficient to submit a case to a jury.").

DuPont is entitled to judgment as a matter of law because there was no legally sufficient evidentiary basis for the jury to find for Plaintiff on his negligence claim or cancerphobia

damages theory, and because Plaintiff failed to prove that DuPont's conduct met the standard for actual malice and was reprehensible, as is necessary to justify an award of punitive damages.

### A.      Mr. Freeman Cannot Recover "Cancerphobia" Damages

Judgment should be entered for DuPont on Plaintiff's cancerphobia damages theory because he failed to prove that he was entitled to cancerphobia damages as a matter of law.[1]  To prove cancerphobia damages, this Court determined that Plaintiff "must show . . . that he [1.] was aware that he in fact possesses an increased statistical likelihood of developing cancer, and [2.] that from this knowledge springs a reasonable apprehension which manifests itself in mental distress." DMO 14, R. 4458 at 96009 (citing *Cantrell v. GAF Corp.*, 999 F.2d 1007 (6th Cir. 1993); *Slane v. MetaMateria Partners, L.L.C.*, 176 Ohio App. 3d 459, 468, 892 N.E.2d 498, 505 (2008).

After much equivocation (detailed in Part II.D), late in trial Plaintiff finally settled on two factual bases for cancerphobia: fear of redeveloping testicular cancer, and fear of developing cancer from radiation incident to his treatment.[2]  A reasonable jury could not have found for Plaintiff because he only presented rank speculation in support of his claim.

**First**, Plaintiff presented no ***scientifically-based evidence*** of an increased statistical risk of redeveloping testicular cancer, or of developing cancer from x-rays or CAT scans.  As this Court noted repeatedly, there is an "objective component" to cancerphobia (*e.g.,* June 27, 2016

---

[1] DuPont respectfully disagrees with the Court's holding in DMO No. 14 to the extent that it would allow Plaintiff to recover for "cancerphobia" as a separate and distinct element of his compensatory damages, if any, for any alleged pain and suffering associated with his testicular cancer. This presents a near certain risk of duplicative damages, and effectively transforms "cancerphobia" into an independent emotional distress claim, which this Court has already dismissed as a matter of law. *See* DMO No. 14, R. 4458, at 96011; *Lavelle v. Owens-Corning Fiberglas Corp.*, 30 Ohio Misc. 2d 11, 14-15 (Cuyahoga Cty. 1987). DuPont preserves and incorporates its previously made arguments in this respect, which represent an independent basis for judgment as a matter of law.
[2] Plaintiff withdrew portions of his C8 induced cancerphobia claim during trial, and then conclusively withdrew it on June 28, 2016.  *See* June 28, 2016 Trial Tr. at 9:13-14.

Trial Tr. at 245:25-246:1), which required Plaintiff to prove "that there is, in fact, an increased risk in a *scientific* sense." June 17, 2016 Trial Tr. at 227:17-20 (emphasis added).

Plaintiff failed to present a non-speculative basis from which the jury could conclude that he was aware he had an increased statistical likelihood of redeveloping cancer. It was undisputed that Plaintiff's testicular cancer was caught in its early stages, treated shortly after Plaintiff was diagnosed, and successfully removed over sixteen years ago. *See* June 7, 2016 Trial Tr. at 28:7-9, 52-65, 86:6-10, 185:10-14, 186:5-8. Plaintiff's medical records reflect that he recovered from his surgery well, had "an excellent chance of being cured without any problems," June 7, 2016 Trial Tr. at 94:10-13, and consistently showed no symptoms and "no signs of recurrent disease." *Id.* at 183:10-14; June 17, 2016 Trial Tr. 165:8-17, 167:2-5, 173:3-7, 175:11-15, 177:21-25, 179:2-6, 181:10-17. Mr. Freeman even stopped his cancer-screening regimen over six years ago, and has not seen his oncologist since July 2010 (hardly a sign of someone suffering from cancerphobia). *See* June 7, 2016 Trial Tr. at 28:15-18, 179:8-11; June 17, 2016 Trial Tr. at 176:14-22.

Plaintiff's positive prognosis, and the absence of any medically-founded reason to fear redevelopment, was confirmed by Dr. Bahnson. Dr. Bahnson admitted that he could not quantify Plaintiff's future risk of cancer. June 7, 2016 Trial Tr. at 197:9-14. He also conceded that he has never had a patient like Plaintiff—with stage 1 testicular cancer, removed surgically with clear margins, and cancer-free for sixteen years—who then later redeveloped cancer. *Id.* at 186:12-15. Dr. Bahnson likewise agreed that Plaintiff "is likely to never have another cancer in his life." *Id.* at 120:16-18. This testimony flatly belies any claim that Plaintiff is, in fact, at an increased statistical *likelihood* of redeveloping testicular cancer, as the jury was instructed it must find to award cancerphobia damages to Plaintiff.

Plaintiff also had no science-based reason to fear development of cancer from his surveillance regimen.  Dr. Bahnson conceded that Plaintiff had the standard, routine surveillance for someone in his situation and is *not* likely to contract cancer as a result of radiation, *id*. at 120:11-18, and Plaintiff himself admitted that neither his treating physicians nor the professionals from whom he obtained a second opinion at Indiana University told him that CAT scans or x-rays placed him at any increased risk of developing cancer.  *See id*. at 188:8-10; June 17, 2016 Trial Tr. at 155:23-156:19.  There is no rational, scientific evidence supporting the jury's verdict on this issue.

Plaintiff admitted that his cancerphobia was developed—not when he filed his complaint nor at the time of his surgery—but rather in preparation for, or at, trial.  June 17, 2016 Trial Tr. at 157:1-16 (source of fear was after he "heard about this testimony in the trial about the – the scans and stuff, [he] became – and in preparation for the trial … became curious"); *id.* at 153:6-24 (Plaintiff testified that "as Dr. Bahnson explained it, it heightened my awareness of [an increased risk of cancer] and increased my anxiety about that"); June 7, 2016 Trial Tr. at 188:14-19 (Bahnson admitting he discussed CT scans with Mr. Freeman during lunch break during trial: "Q. You've never discussed that issue with Mr. Freeman? A. I discussed it with him at the break today.").  Any alleged awareness of increased risk based on radiation sprang from recent trial preparation—rather than at the time Mr. Freeman filed his complaint—and is untethered to any independent information or advice received from any medical professionals. This simply cannot support the verdict in his favor.  *Compare Cantrell,* 999 F.2d at 1010 (cancerphobia recovery allowed because plaintiff "testified that he was told by one of his treating physicians that his throat would probably become cancerous, and that he had been instructed to have periodic biopsies to monitor the condition of his larynx"); *see also Thornton v. Vonage Tel. Servs.*, 2011

U.S. Dist. LEXIS 19383, at *12-13 (N.D. Ohio Feb. 28, 2011) ("the court must examine the facts as they exist when the complaint is filed") (quoting *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 830 (1989)); *Becker v. Montgomery*, 43 Fed. Appx. 914, 917 (6th Cir. 2002) ("when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist") (citing *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 437 (6th Cir. 1988)).

**Second,** the utter lack of a scientific basis for Plaintiff's apprehension means it cannot be ***reasonable*** as a matter of law.  *See Cantrell,* 999 F.2d at 1012 (holding "evidence of an increased risk of cancer is relevant to whether a plaintiff's fear of cancer is reasonable, as required by *Lavelle*"); *Perry v. Dept. of Rehab. and Corr.*, 2013 Ohio App. LEXIS 3992, *6 (Ohio App. Sept. 5, 2013) (unfounded fear of cancer is not actionable because "[v]irtually everyone has some greater or lesser fear of getting cancer"); DMO No. 14, R. 4458, at 96009; *Lavelle v. Owens-Corning Fiberglas Corp.*, 507 N.E.2d 476, 481 (Com. Pl. 1987); *see also* 1-4 Toxic Torts Guide § 4.02 (2015) (same).

Indeed, Plaintiff failed to prove he had a *reasonable* apprehension of developing cancer that manifested itself as mental distress.  Plaintiff himself repeatedly admitted that he is inclined to "expect the worst."  June 17, 2016 Trial Tr. at 66:19-67:7, 70:9-11, 76:6-11, 115:16-116:6. Yet in spite of this, he has not had an appointment with his oncologist for at least six years, and decided not to be rescreened for recurrence of his testicular cancer.  *See* June 7, 2016 Trial Tr. at 28:15-18, 179:8-11; June 17, 2016 Trial Tr. at 176:14-22.  By contrast, Mr. Freeman has scheduled annual visits to the urologist to monitor his *unrelated* risk for prostate cancer.[3]

---

[3] Evidence adduced at trial reveals that Plaintiff's ongoing cancer monitoring is related to "an [eighteen] percent probability of [developing] cancer of the prostate ***as a result of his family and medical history***, not any increased likelihood of cancer relating to C8.  June 7, 2016 Trial Tr. at 198:18- 19; *see id.* at 165:15-17, 192:1-7 (medical records reflect that Plaintiff had a "history of elevated PSA and a family history of adenocarcinoma of the prostate").

June 17, 2016 Trial Tr. at 168:25-169:1, 171:25-172:7.  Plaintiff has simply not adduced evidence establishing he has a *reasonable* fear of cancer based on reoccurrence or radiation.

**Finally**, Plaintiff presented no evidence that he suffered from any "phobia."  The alleged cancerphobia has not disrupted his daily life, caused him to seek treatment from mental health professionals, or manifested any other symptoms associated with traditional phobias.  Anyone can say that they are concerned about cancer – but that is not the threshold to reach the jury on this question.  Plaintiff simply adduced no evidence of a heightened concern of cancer compared to any other member of society.

For all of these reasons, and those further described in DuPont's prior briefing and oral arguments, Plaintiff's cancerphobia damages theory fails as a matter of law because he simply cannot meet either the "increased statistical likelihood" or "reasonable apprehension" standards.

### B.     Mr. Freeman's Negligence Claim Fails as a Matter of Law.

To recover on a negligence claim, Plaintiff must prove that: (1) DuPont owed him a duty, (2) that DuPont breached that duty, and (3) that the breach of the duty proximately caused his injury. *Chambers v. St. Mary's School*, 697 N.E.2d 198 (Ohio 1998). Because Plaintiff failed to present sufficient evidence DuPont owed or breached a legal duty, and/or that exposure to C8 specifically caused his testicular cancer, his negligence claim fails as a matter of law.

### 1.   Plaintiff Did Not Establish that DuPont Knew or Should Have Known Harm to Humans Was Likely at Community Levels of Exposure to C8

***Plaintiff did not prove it was <u>foreseeable</u> to DuPont that C8 was likely to cause human harm at community exposure levels.***  To establish "duty," Plaintiff must prove that DuPont knew, or that a reasonable corporation in DuPont's circumstances should have known, that its conduct was likely to injure Plaintiff during the relevant time period.  That is, the "duty" inquiry turns on whether injury to Plaintiff was reasonably foreseeable at the time based on known

community levels of exposure. *See Menifree v. Ohio Welding Prods., Inc*., 15 Ohio St. 3d 75, 77 (1984) ("The existence of a duty depends on the foreseeability of the injury"; the "test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act"); DMO No. 6, ECF No. 4184, at 7 ("[i]n Ohio . . . the existence of a duty derives from the foreseeability of the injury, which usually depends upon the defendant's knowledge"). Thus, at trial the question for the jury should have been whether from 1993 to 2000 (i.e., when Mr. Freeman was first purportedly exposed to C8 until the removal of his cancer) "'a reasonably prudent person would have anticipated that an injury was likely to result from' DuPont's release of C8 from the Washington Works plant." DMO No. 6 at 10 (quoting *Menifee*, 15 Ohio St. 3d at 77)).

Here, Plaintiff failed to prove that it was foreseeable to DuPont (or to a reasonable company in similar circumstances) that harm to humans was likely at community levels of exposure to C8. The evidence presented in fact showed the opposite, *i.e.*, that during the relevant time, DuPont had no knowledge or expectation based on the information received from 3M, or from any of the animal studies, research, and/or DuPont's own monitoring of its workers, that there was any likelihood of any harm to community members at the relatively low C8 levels outside the plant. *See, e.g.,* June 3, 2016 Trial Tr. at 103:25-104:24; 141:14-19; 176:4-177:11; 178:5-12; 198:8-199:12; 203:19-23 (Dr. Siegel agreeing that "[i]n terms of foreseeability or likelihood of harm for someone in [Plaintiff's] position … his blood level was always far, far below what 3M was telling DuPont was a safe level"). Indeed, DuPont never received reports of any clusters of cancer or other disease in the community during the relevant time. *See* June 28, 2016 Trial Tr. at 29:19-30:5; June 30, 2016 Trial Tr. at 177:17-178:1.

Moreover, DuPont's own employees examining the purported health effects of C8 were themselves drinking local water containing C8 because they believed it was not likely to cause harm to humans at low exposure levels. *See, e.g.,* June 3, 2016 Trial Tr. at 105:8-13; June 21, 2016 Trial Tr. at 30:1-8; June 22, 2016 at 228:2-16 (Dr. Playtis testimony: "Q. …[D]id you ever believe that trace, low levels of C8 reaching the community were likely to cause any harm at all to anyone in the community? A. No. Q. Would you have kept drinking the water yourself knowing it had C8 in it, knowing that was the water that was serving your house, if you believed it was likely to cause harm to humans? A. No."); June 23, 2016 Trial Tr. at 172:19-173:1 (Zipfel testimony that he drank Lubeck water at home knowing it had C8); June 29, 2016 Trial Tr. at 21:5-14 (Dr. Rickard testimony: "Q. And when you went to visit the plant out at Washington Works, were you aware of the tests that showed that over time the plant drinking water had anywhere from .5 to more than 3 parts per billion in the drinking water? A. Yes, I knew that. Q. And did you drink the water while you were at the plant? A. Yes, I did. Q. Would you have drunk the tap water if you thought it was likely to cause harm to humans? A. No."); June 30, 2016 Trial Tr. at 212:16-23; July 5, 2016 Trial Tr. at 169:4, 172:18-20, 195:2-4. The unforeseeability of injury to individuals like Plaintiff was further reflected by various state and federal regulators during the relevant time period, which had determined there was no human harm from C8 at the relatively higher levels of exposure of 3M and DuPont employees. *See, e.g.,* June 6, 2016 Trial Tr. at 191:9-192:19; 193:12-194:17; *see also id.* at 281:3-9 (Siegel: "My testimony is not that DuPont failed to disclose water levels to government authorities").

Likewise, DuPont did not know at the relevant time that C8 was present in Plaintiff's drinking water from Little Hocking. In the 1980s, after an initial test of Little Hocking water for

C8 showed levels near or at the detection limit, DuPont conducted three additional tests where the results were "none detected."  *See* June 21, 2016 Trial Tr. at 98:11-102:20.

For all these reasons, there was no evidence presented at trial that it was *foreseeable* to DuPont at the relevant time that C8 was likely to cause harm to Plaintiff.

2.  Plaintiff Did Not Prove that DuPont Failed to Use the Care that a Reasonable Corporation Would Have Under Similar Circumstances

Even if Plaintiff had introduced enough evidence at trial that DuPont owed him a legal duty, he still failed to prove that DuPont actually breached any such duty. Indeed, Plaintiff's only evidence on this issue was the testimony of Dr. Siegel and Mr. Petty.  But neither of these experts presented any evidence that DuPont failed to use the care that a reasonable corporation would have under similar circumstances, based on what was known as the time, as required to satisfy the "breach" element of a negligence claim.  Further compounding the prejudice, and despite this Court's ruling, Dr. Siegel repeatedly testified regarding purported ethical, moral, or other extra-legal standards that are *not* the applicable standard defined by Ohio law.

Dr. Siegel, for instance, did not testify about what a reasonable corporation would have done (*e.g.*, industry standards) at all, and instead testified regarding ethics, the "public health" duty of care, and the "precautionary principle."  *See, e.g.,* June 2, 2016 Trial Tr. at 224:16-19, 62:13-24. 69:8-14, 73:21-74:4, 112:17-113:2, 121:25-122:1, 156:19-157:8, 198:11-21 (claiming DuPont violated "public health duty of care"); June 3, 2016 Trial Tr. at 184:5-8 (opining that any "comparison of what DuPont was doing with other companies has no relevance on whether they were following a public health duty of care. What matters is simply what they were doing"); June 6, 2016 Trial Tr. at 214:15-24 (testifying on "corporate ethics" and what would be "morally irresponsible").  Dr. Siegel admitted that the precautionary principle focuses on what an extremely careful or "ethical" company would do—not what a "reasonable" company would do.

12

*See* June 2, 2016 Trial Tr. 74:1-4 (the "precautionary principle basically states that we don't wait until we have definitive evidence that a chemical is causing human harm before we step in and try to prevent or alleviate that exposure"). Dr. Seigel's lecture may have been appropriate in a classroom, but it has no place in a court of law. Allowing Dr. Seigel to spend days on the witness stand to advocate an irrelevant public health duty of care as the cornerstone for liability was overwhelmingly and unfairly prejudicial. *See* June 3, 2016 Trial Tr. at 183:4-8 (admitting precautionary principle is "different than the legal standard that applies in this case").

Plaintiff's attempt to establish a duty of care through Dr. Siegel's testimony on such ethical duties failed to satisfy his burden at trial. DuPont's standard of care is defined solely by reference to the duties that it is "*legally required* to undertake." *In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164, *90 (N.D. Ohio Aug. 8, 2005) (emphasis added). "It is *this* standard, and not what an ethical corporation 'should have done,' that matters." *Id.* (emphasis added). For that reason, this Court previously ruled that DuPont's legal duties in this case are governed by Ohio law, and that DuPont's alleged compliance or noncompliance with any subjective standard of ethics, morality, or social responsibility is not relevant to DuPont's legal liability in this case. MIL Hearing Tr. at 99:8-10; *see also In re Welding Fume Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 146067, at *146 (N.D. Ohio June 4, 2010) ("It is only the defendants' conduct itself that is relevant and admissible, not whether that conduct measures up to any moral or social standard held by an expert"); *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 673 N.E.2d 1311, 1319 (Ohio 1997) (noting that "because of the difficulties of setting moral standards and devising workable rules to cover all situations," there is no duty under Ohio law to take affirmative action to aid a stranger, despite any "moral obligation" to do

13

so).  Dr. Siegel's testimony was nothing more than his subjective "moral or social standard," which cannot support a claim of breach of an actual legal duty.

Indeed, Dr. Siegel actually conceded that DuPont followed his view of the appropriate standard of care with respect to its employees (who were also members of the public) and made appropriate disclosures to government regulatory agencies, who are charged with protecting the public.  *See, e.g.*, June 3, 2016 Trial Tr. at 163:14-16, 158:12-13, 181:20-182:14, 260:25-261:2, June 6, 2016 Trial Tr. at 79:6-9.

Further, while Mr. Petty purported to testify regarding an industry standard of care, and claimed that DuPont violated that standard, he too failed to compare DuPont's conduct to anyone else's in the industry and could not even name any other companies other than 3M that used C8.  *See* June 14, 2016 Trial Tr. at 118:18-123:9.  For example, Mr. Petty testified that DuPont should have complied with a vaguely defined "honor system" with the EPA for C8 emissions.  *See* June 14, 2016 Trial Tr. at 53:25-55:2.  However, Mr. Petty failed to compare DuPont's conduct to anyone else's in the relevant industry, did not identify any violations of EPA regulations, and acknowledged that C8 was not included on the list of substances required to be reported under the Toxic Release Inventory.  *See* June 14, 2016 Trial Tr. at 118:18-123:9, 286:2-4; June 15, 2016 Trial Tr. at 104:25-105:2.  He did not even know whether 3M incinerated C8, although Plaintiff repeatedly insisted DuPont should have.  *See* June 15, 2016 Trial Tr. at 99:11-13.

Nor could Mr. Petty even identify any applicable regulations relating to industrial use of C8—because there were none.  *See* June 14, 2016 Trial Tr. at 286:2-4 (admitting C8 is not a regulated chemical); June 15, 2016 Trial Tr. at 104:25-105:2 (admitting C8 is not listed on the Toxic Release Inventory).  At most, Mr. Petty claimed that DuPont should have taken certain actions even in the absence of any regulations because DuPont allegedly had "better

14

information" than the regulators and therefore needed to "self-regulate" and implement a "zero emissions" policy for C8. *See* June 13, 2016 Trial Tr. at 133:2-18, 171:13-172:4. But Mr. Petty conceded that this standard he created is *not* the applicable legal standard. *See* June 14, 2016 Trial Tr. at 125:22-126:5. His testimony, like Dr. Siegel's, thus did not support any claim that DuPont breached any legal duty.

DuPont's witnesses established that DuPont acted reasonably in its handling of C8 and its efforts to protect human health. Dr. Playtis, the occupational health coordinator at the plant, for instance, testified that he was personally involved in sampling the water and the air for C8, and monitoring and evaluating the blood levels of employees who worked directly with C8. *See, e.g.*, June 21, 2016 Trial Tr. at 35:5-19. Dr. Playtis and other DuPont employees further testified that the company took a number of precautions with respect to C8, including requiring protective equipment for employees, setting exposure limits at levels at which DuPont never expected any harm, and taking steps to reduce community exposures to C8, including closing the supernate ponds, sending C8 waste to a controlled landfill, and installing air scrubbers, recovery systems, and filters to lower plant emissions. *See id.* at 106-108; June 22, 2016 Trial Tr. at 251:14-276:14.

Plaintiff's experts at trial agreed—opining that DuPont acted reasonably in monitoring the health of its employees exposed to C8, and setting conservative exposure limits and community exposure guidelines. *See* June 3, 2016 Trial Tr. at 181:20-182:3, 261:1-2 ("DuPont acted very, very admirably with respect to protecting its [] employees"); June 6, 2016 Trial Tr. at 75:24-77:9, 187:19-22 (admitting that DuPont acted reasonably in setting very conservative screening levels). Plaintiff came nowhere close to adducing sufficient evidence to show that DuPont failed to use the care that a reasonable corporation would have used under similar circumstances.

3. Plaintiff Presented No Evidence that C8 More Likely than Not Specifically Caused His Testicular Cancer, and Instead Presented Evidence Confirming the Idiopathic Nature of Testicular Cancer

Plaintiff failed to meet his burden of proving specific causation as a matter of law, *i.e.*, that his testicular cancer more likely than not resulted from exposure to C8.[4]  Dr. Bahnson's "differential etiology" opinion was the *only* evidence that Plaintiff introduced on specific causation. That testimony was inadmissible under *Daubert* as speculative, but in any event was insufficient because Plaintiff's expert did not – and could not – ***meaningfully*** exclude testicular cancer's idiopathic nature.   That is, Dr. Bahnson failed to provide any scientifically-valid methodology for excluding the far more likely scenario that Plaintiff's testicular cancer resulted from an unknown cause, as it does in the vast majority of testicular cancer.

A differential etiology is insufficient to prove specific causation in the context of a disease that is largely idiopathic in nature.  *See, e.g*., *Tamraz v. Lincoln Elec. Co*., 620 F.3d 665, 675 (6th Cir. 2010) (idiopathic causation is "impossible to ignore and difficult to rule out" as part of a differential etiology).  That is because "[w]here the cause of the condition is unknown in the majority of cases," the expert cannot properly conclude based upon a mere differential etiology that plaintiff's exposure to a particular compound "was the *most* probable cause" of the plaintiff's condition.  *See Bland v. Verizon Wireless, L.L.C.,* 538 F.3d 893, 897 (8th Cir. 2008). Indeed, this is because the most probable cause is simply "unknown."  *Id.*; *see also* Federal Judicial Center, Reference Manual on Scientific Evidence, Reference Guide on Epidemiology, p.

---

[4] For Plaintiff to prove that his testicular cancer was "more likely than not" caused by exposure to C8, he must show that "but for" his exposure to C8 he would not have developed his illness. *See* Ohio Jury Instruction § 405.01; *see also Anderson v. St. Francis-St. George Hosp*., 671 N.E.2d 225, 227 (Ohio 1996) ("The standard test for establishing causation is the *sine qua non* or 'but for' test."). Plaintiff's counsel agreed in opening statement that this is the appropriate test for causation under Ohio law. *See* June 1, 2016 Trial Tr. at 171:3-5 ("We will prove, ladies and gentlemen, that ***but for*** the testicular-cancer causing C8 in his water, Mr. Freeman would never have had testicular cancer.") (emphasis added). Applying this test, if the cause of Plaintiff's testicular cancer is attributable to a cause (whether known or unknown) for which DuPont is not liable, then Plaintiff has not met his burden. *See Anderson*, 671 N.E.2d at 227 ("[T]he defendant's conduct is not the cause of the event (or harm) if the event (or harm) would have occurred regardless of the conduct").

618 (differential etiology is "of little benefit" in evaluating the cause of "diseases for which the causes are largely unknown.").

Dr. Bahnson admitted that 85% of testicular cancer is idiopathic, meaning that it has no known cause in 85% of cases. *See* June 7, 2016 Trial Tr. at 147:6-12, 153:4-8, 164:14-17, 166:22-167:2. He also admitted that "there are no tests that allow you to identify the cause of the cancer"—a critical admission that there is no reliable way to tell the cause of a testicular cancer. *Id*. at 164:21-23. Despite this, Dr. Bahnson's "differential etiology" did not meaningfully account for the possibility that Mr. Freeman's cancer was the result of an as-yet unknown cause. Instead he assumed that C8 caused Plaintiff's cancer because of the Science Panel's probable link report, Mr. Freeman's age, his "prolonged" exposure to C8 and the "unusual" nature of his tumor.[5] *See* June 7, 2016 Trial Tr. at 129:25-130:2, 146:16-147:5. As the jury instructions required both that C8 was a substantial factor and a "but for" cause, this testimony was insufficient for a number of reasons.

First, the Science Panel's probable link finding does not establish *specific* causation as to Plaintiff. *See Tamraz,* 620 F.3d at 670-71 ("That manganese could cause Parkinson's Disease in someone like Tamraz does not show that manganese did cause Tamraz's Parkinson's Disease."). Like the *Tamraz* expert, Dr. Bahnson failed to identify any tests he had done to show why C8 caused this particular case. Indeed, Dr. Bahnson "never explained how he made this leap—how *this* case stemmed from [C8] exposure" and his testimony thus suffers from a lack of foundation. *Id*. ("testimony thus suffers from a lack of foundation … why manganism caused *this* case of Parkinson's Disease.") (emphasis added); *Nelson v. Tenn. Gas Pipeline Co*., 243 F.3d 244, 253

---

[5] DuPont notes this testimony violated Plaintiff's agreement that Dr. Bahnson would not base his opinion on the nature of Plaintiff's tumor. *See* EMO No. 4, R. 4518, at 97998 ("[Plaintiff] confirms that 'Dr. Bahnson does not intend to offer the opinion that Plaintiff's age and tumor type are indicative of C8-induced testicular cancer as DuPont posits." (*quoting* Pl.'s Mem. in Opp. at 17.)).

(6th Cir. 2001) (assumption without foundation "did not provide a valid scientific basis for the opinion on causation").

Dr. Bahnson merely *speculated* that C8 caused Plaintiff's illness. He did not explain what enabled him to determine that C8 affirmatively caused Mr. Freeman's cancer, even though the great majority of testicular cancer cases occur without any known cause. In other words, Dr. Bahnson did not link C8 to Plaintiff's cancer in a scientifically valid way even though he agreed that "[Plaintiff] could have gotten his testicular cancer even without any exposure to C8." *Id.* at 162:3-6. That concession was fatal in light of his testimony that "the vast majority" of men who were exposed to similar levels of C8, even at DuPont's plant, did not develop testicular cancer. *See* June 7, 2016 Trial Tr. at 161:18-23. It fails to meet the "but for" requirement given in the jury instructions.

Even Dr. Bahnson's other stated rationales do not have the scientific and factual support necessary to form the basis for a valid expert opinion. Dr. Bahnson did not evaluate Mr. Freeman's **actual** exposure or dose of C8, even though that is a crucial step in arriving at a specific causation opinion.[6] *See* June 7, 2016 Trial Tr. at 124:14-19 (instead relying on Dr. MacIntosh's conclusion that "Mr. Freeman consumed C-8 contaminated water with at least .05 parts per billion of C-8 for many years"); *id.* at 168:9-13 ("Q. Well, my question was, your opinions would have been the same *no matter how low Mr. Freeman's C-8 blood level was*? A. I believe they would. I have to examine that carefully and would have to investigate the work that's been done relating cancers to blood levels") (emphasis added). And as to the "unusual" teratoma tumor, Dr. Bahnson conceded at trial that a teratoma testicular tumor has never been

---

[6] DuPont recognizes that this Court has previously ruled that plaintiffs are not required to prove dose based on its interpretation of the Leach Agreement, but DuPont preserves all of its previously asserted arguments regarding the interpretation of the Leach Agreement. Plaintiff has not substantiated his dose of C8 specifically caused his testicular cancer.

associated with C8 exposure.  *See* June 7, 2016 Trial Tr. at 172:12-15.  Because there is no factual or scientific link to C8 other than DuPont's stipulation to *general* causation, Dr. Bahnson's testimony is little more than unsupported *ipse dixit*.

Second, Dr. Bahnson's differential diagnosis excluding idiopathic causation lacked the requisite scientific rigor.  *See Tamraz*, 620 F.3d at 674 ("Did the expert **reliably** rule out the rejected causes?") (emphasis added).  Dr. Bahnson offered no methodology for ruling out unknown causes in this particular case.  As outlined above, Dr. Bahnson failed to provide a non-conclusory, scientifically-valid explanation for excluding idiopathic causation. *See, e.g.*, June 7, 2016 Trial Tr. at 146:10-147:5.  Dr. Bahnson's testimony was thus insufficient to carry Plaintiff's burden of proving specific causation and has no evidentiary weight as matter of law. *See, e.g., Tamraz*, 620 F.3d at 674; EMO 4 at 8, R. 4518; *see also Best v. Lowe's Home Centers, Inc.*, 563 F.3d 171, 179 (6th Cir. 2009) ("the doctor must provide a reasonable explanation as to why he or she has concluded that any alternative cause suggested by the defense was not the sole cause," such as idiopathic causation) (internal quotations and brackets omitted); *Henricken v. Conoco Phillips Co.*, 605 F. Supp. 2d 1142, 1162 (E.D. Wash. 2009) (excluding the plaintiff's specific causation expert where the expert's "only reason cited for distinguishing [plaintiff's] disease from one of 'no known cause' was the existence of a known risk factor, namely the exposure to [the alleged causal agent]" in a case where the plaintiff's disease was idiopathic in 80-90% of cases); *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 253 (6th Cir. 2001) (affirming judgment as matter of law for defendant, in part, because "there was 'simply no basis for [the expert's] assumption that PCBs, and not one of numerous other factors, was the cause of plaintiffs' reported maladies").[7]

---

[7] Dr. Bahnson not only failed to adequately rule unknown causes out of his differential etiology, but he also excluded *other* established causes and risk factors for testicular cancer in Plaintiff's case with no scientifically valid,

Dr. Bahnson's testimony should have been inadmissible, but in any event it was insufficient as a matter of law and, because he was Mr. Freeman's only witness to opine on specific causation, he adduced insufficient evidence of specific causation at trial, entitling DuPont to judgment on his negligence claims.

4.  Plaintiff Cannot Prove DuPont's Negligence With Conduct Occurring After His Injury

The theory of harm presented at Mr. Freeman's trial rested on his testicular cancer, which was diagnosed and successfully removed in 2000. Yet, a significant part of Mr. Freeman's case was dedicated to post-2000 evidence. This post-injury evidence was both irrelevant and unfairly prejudicial to DuPont. It included, but was not limited to, the following:

- Evidence regarding the TSCA allegations and settlement in 2004 to 2005. *See, e.g.*, June 3, 2016 Trial Tr. at 48:21-72:25; *id*. at 64:20-67:20 (Plaintiff's counsel reading to the jury each of the allegations in the TSCA complaint during direct examination of witness); June 10, 2016 Trial Tr. At 36:24-42:3 (similar during Reilly deposition played before jury).

- Evidence regarding the public meeting held by the Little Hocking Water Association on February 11, 2002. *See, e.g.*, June 24, 2016 Trial Tr. at 105:11-117:24; *id*. at 108:8-22 (Plaintiff's counsel reading the following statements from that meeting to the jury: "Something caused my cancer. Something caused my sheep to die. Something caused my rabbits to die, and I want to know if you guys are paying for people to have tests to see if C8 is in our water system?").

- Little Hocking Water Association website postings in 2003. *See, e.g.*, June 24, 2016 Trial Tr. at 100:22-104:24; June 21, 2016 Trial Tr. at 196:7-247:3; *id*. at 211:1-4 (Plaintiff's counsel reading into the record the following postings: the "CAT Team generated much criticism and controversy"); *id*. at 217:19-23 (similar: "the EWG contends that the screening levels should be more in the range of 1.5 to 15 ppb, which is in far contrast to the 150 ppb advocated by the CAT

---

reasonable explanation for doing so. For example, Dr. Bahnson conceded that testicular cancer may be caused by DNA replication errors and by inherited genetics unrelated to C8, but he did not explain why they did not cause Plaintiff's illness or why he did not conduct genetic testing on Mr. Freeman. *See* June 7, 2016 Trial Tr. at 162:9-21, 165:10-14. Further, although Plaintiff's same age and race were reported in numerous studies and epidemiology reports as risk factors increasing his chances of developing testicular cancer, Dr. Bahnson dismissed the significance of these risk factors in his evaluation of Plaintiff without providing a scientifically-sound explanation for doing so. *Id*. at 141:11-12, 141:16-142:7, 143:2-11, 162:22-25, 163:16-19, 163:20-164:13. The Sixth Circuit has held that this exact type of conclusory, unscientific method of excluding possible causes is impermissible. *See, e.g., Nelson*, 243 F.3d at 253.

Team"); June 24, 2016 Trial Tr. at 103:19-23 (similar: "Little Hocking Water Association learned in January 2002 that PFOA was in all four of their production wells, almost 18 years after DuPont knew that C8 was present in the Little Hocking Water Association water supply").

- Evidence regarding a different DuPont plant built in Fayetteville, North Carolina in 2002. *See, e.g.,* June 21, 2016 Trial Tr. at 230:1-4 (Plaintiff's counsel asking DuPont witnesses "DuPont was able to arrive at zero emissions in North Carolina, correct, of C8, zero emissions?"); June 29, 2016 Trial Tr. at 201:23-202:3 ("After this 3M announcement that 3M was getting out of the perfluoroalkyls business in the 2000s … DuPont decided to make its own C8 manufacturing plant in Fayetteville, North Carolina, right? A. Yes, we did.")

None of this or similar evidence could support Mr. Freeman's negligence claim as a matter of law because DuPont's conduct or knowledge regarding C8 after 2000 unquestionably could not have proximately caused Plaintiff's testicular cancer. *See, e.g., Krumpelbeck v. Breg, Inc.*, 759 F. Supp. 2d 958, 969-70 (S.D. Ohio 2010) ("Significantly, the emails are dated approximately nine months after Plaintiff's surgery, which makes them irrelevant to the issue of what Defendant knew or should have known before Plaintiff's surgery"); *Toole v. McClintock*, 999 F.2d 1430, 1434 (11th Cir. 1993) (trial court erred in admitting a later-published FDA report into evidence, requiring a new trial because "[a]s a simple matter of timeliness, those statements are irrelevant and inadmissible on what [the defendant] knew or should have known about risks before [the dates of plaintiff's medical procedures]"); *Gulbranson v. Duluth, Missabe & Iron Range Ry. Co.*, 921 F.2d 139, 142 (8th Cir. 1990) (minutes of a meeting that occurred months after the accident at issue were inadmissible because they were "not probative of [defendant's] knowledge" at the time of the accident at issue; were "too remote in time from the date of the accident;" and had "no tendency to make the existence of any fact that [was] of consequence more or less probable"); *LeBoeuf v. K-Mart Corp.*, 888 F.2d 330, 333 (5th Cir. 1989) (excluding evidence of subsequent condition of floor in defendant's store, noting that it is "what was happening at the given time . . . that counts").

*      *      *

In sum, Mr. Freeman failed to present evidence proving his cancerphobia damages theory, or that DuPont owed him a duty, violated any legal standard of care, and that C8 specifically caused his testicular cancer. Instead he focused on amorphous and inapplicable standards that misled the jury and ignored Ohio law, and on events occurring after his injury which cannot prove causation. Because Plaintiff failed to carry his burden, this Court should grant judgment as a matter of law on Plaintiff's negligence claim.

**C.  The Evidence Was Insufficient to Support a Punitive Damages Finding and the Award of Punitive Damages Was Improper As A Matter.**

The punitive damages finding was improper as a matter of law. As DuPont explained in its prior briefing, Plaintiff failed to meet his burden of proving DuPont acted with actual malice or that it consciously disregarded evidence of a great probability that C8 exposure at community exposure levels would cause human harm. *See* ECF 4569, 4574. Indeed, DuPont's affirmative and extensive measures to protect those exposed to C8 shows its conduct fell far short of the reprehensibility necessary to support a punitive damages award.

Mr. Freeman's case demonstrates a complete absence of the facts necessary to support a finding of actual malice. *McCurdy v. Montgomery County*, 240 F.3d 512, 517 (6th Cir. 2001). Under Ohio law, punitive damages are recoverable in a tort action only when compensatory damages have been awarded and "the actions or omissions of th[e] defendant demonstrate malice or egregious fraud." Ohio Rev. Code § 2315.21(C). To establish he was entitled to punitive damages, Mr. Freeman needed to prove by clear and convincing evidence that DuPont acted with actual malice, or a "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio 1987); *McCombs v. Meijer, Inc.*, 395 F.3d 346, 355-56 (6th Cir. 2005) (punitive damages proper only if

defendant "possess[es] knowledge of the harm that might be caused by his behavior, and nevertheless, *consciously disregard[s]* the injured party's rights or safety") (emphasis added).

Punitive damages are a "quasi-criminal punishment" and are *only* appropriate for conduct that plaintiff has proven to be "especially reprehensible." *Ross v. Home Depot USA Inc.*, 2014 U.S. Dist. LEXIS 133507, at *13 (S.D. Ohio Sept. 23, 2014). Indeed, "[f]or punitive damages to be appropriate … [s]ubstantial harm must be a *near certain consequence* of the defendant's actions." *Terek v. Finkbiner*, 2015 U.S. Dist. LEXIS 124939 (N.D. Ohio Sept. 18, 2015) (emphasis added) (citing *Motorists Mut. Inc. Co. v. Said*, 590 N.E.2d 1228 (Ohio 1992)). Absent this "near certainty," even a reckless actor who has knowledge of the possibility that his or her actions may result in substantial harm "is not behaving maliciously." *Kuebler v. Gemini Transp.*, 2013 U.S. Dist. LEXIS 172769, at *12 (S.D. Ohio Dec. 9, 2013).

At trial, Plaintiff offered no evidence of actual malice, let alone proved a conscious disregard of an almost certain risk of substantial harm to those in Mr. Freeman's position. The testimony of Plaintiff's own expert, Dr. Siegel, exemplifies the absence of any evidence that DuPont knew with "near certainty" that individuals such as Plaintiff would suffer harm. By way of example, Dr. Siegel conceded that he did *not* see a single document from the relevant period indicating that DuPont was actually aware of the risk that C8 exposure at levels comparable to those of Mr. Freeman could cause human cancer. *See* June 6, 2016 Trial Tr. at 81:3-22; *see also* June 8, 2016 Trial Tr. 71:7-17 (DuPont employee Bowman testifying he was not "aware of or knew [anyone] in the company [who] thought that the levels of C8 in this drinking water was a potential danger"). And as explained at Part I.B.1, DuPont's employees who were assessing the exposures and risk were themselves drinking the water.

In fact, when asked whether C8 could be classified as a confirmed or suspected human carcinogen during the relevant time period, Dr. Siegel admitted that studies linking C8 to human cancer were not conducted until the "last … five or seven years."  June 6, 2016 Trial Tr. at 25:6-14; June 7, 2016 Trial Tr. at 169: 8-14.  Dr. Siegel also acknowledged that a litany of internal documents existed in which DuPont expressed its belief that there were no human health risks at the relatively low levels of C8 present in the community.  *See* June 3, 2016 Trial Tr. at 104:20-24; June 6, 2016 Trial Tr. at 81:23-82:5.  Dr. Siegel even agreed it was reasonable for DuPont to rely on information from its supplier 3M and numerous public pronouncements from regulators and independent scientists regarding the absence of adverse health effects at low levels of C8 exposure.  *See* June 3, 2016 Trial Tr. at 104: 9-13, 249:6-16, 253:25-254:11; June 6, 2016 Trial Tr. at 95:10-19.  The evidence at trial confirms that DuPont did not know of a link between community levels of C8 exposure and harm in humans.  Indeed, all the evidence prior to 2012 was that community levels of exposure *did not* pose a "great probability of causing substantial harm."

The evidence also demonstrated that DuPont reasonably did not know about any human harm from the airborne emissions raised during the trial in this case.  Plaintiff purposefully conflated the foreseeability of C8 percolation with malice or conscious disregard of substantial harm.  *See, e.g.,* Plf.s' Opp. Mot. for Directed Verdict [ECF 4570] at 4-5 (arguing that "it should have been foreseeable to DuPont that this percolation process could have caused C8 to end up in the Little Hocking drinking water"); June 16, 2016 Trial Tr. at 120:17-127:6.  Yet evidence of mere foreseeability is simply *not* enough to prove malice under Ohio law: the "principle inherent

in the award of punitive damages is that something more than mere negligence is required."
*Preston*, 512 N.E.2d at 1176.[8]

But Plaintiff offered no evidence that anyone, let alone DuPont, knew that C8 could travel through the air and get down into the Little Hocking water system in sufficient amounts to actually cause human harm. *See* June 14, 2016 Trial Tr. at 219: 11-21 (Mr. Petty admitting that Little Hocking tests were at .8 ppb in March 1984 and then "not detected" in June 1984); *id*. at 230:4-232:17 (.8 revised to .6 ppb); *id*. at 226:1-12 (agreeing that in Exhibit D.16 DuPont stated in 1984: "The concentrations are very low and, in my judgment, are not cause for concern"), *id*. at 52:2-6 (amounts of C8 at Little Hocking were merely "detectable"). Instead, Plaintiff distorted the legal standard, which this Court allowed, by discussing whether DuPont was "conscious" of something and "disregarded" it. *See* June 3, 2016 Trial Tr. at 95:5-11; June 1, 2016 Trial Tr. at 22:10-23:23.

DuPont's ongoing compliance with applicable laws and regulations, and extensive mitigation efforts relating to C8 made the punitive damages award legally unreasonable. A review of the record demonstrates that the punitive damages award was unreasonable because DuPont's conduct was not sufficiently reprehensible to warrant such an award. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) ("The most important indicium of a punitive damages award is the degree of reprehensibility of a defendant's conduct"). In addition to the lack of evidence concerning DuPont's purported malice, DuPont's conduct did not demonstrate reprehensibility because (1) DuPont not only complied with, but also exceeded, the

---

[8] During closing arguments Plaintiff's counsel attempted to equate conscious disregard with DuPont's purported decision to "put their head in the sand." *See* July 5, 2015 Trial Tr. at 92:15-22. But lack of knowledge of a fact simply cannot rise to the level of "near certainty" required to establish actual malice. *Kuebler*, 2013 U.S. Dist. LEXIS 172769 at *12.

requirements of applicable laws and regulations, and (2) DuPont engaged in significant efforts to mitigate the potential for harm to be caused by C8.

DuPont's approach to monitoring C8, as well as its compliance with applicable laws and regulations, belies any argument that DuPont's conduct demonstrated reprehensibility sufficient to support the award of punitive damages. *See, e.g., Clark v. Chrysler Corp.*, 436 F.3d 594, 603-4 (6th Cir. 2006); *In re Miamisburg Train Derailment Litig.*, 725 N.E.2d 738, 752 (Ohio Ct. App. 1999); *see also BMW of N. Am. v. Gore*, 517 U.S. 559, 576-577 (1996) ("[e]vidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law").

In *Clark v. Chrysler Corp.*, the Sixth Circuit rejected as excessive a punitive damages award of $3 million, in part, because a "good faith dispute" existed as to whether Chrysler should have conducted particular tests with an automotive part. 436 F.3d at 605-604. The court reasoned that "because the test was neither required by the government nor used by other manufacturers, we *cannot* conclude that Chrysler's failure to adopt the test indicates a level of indifference to or reckless disregard for the safety of others sufficient to weigh in favor of reprehensibility." *Id.* at 603 (emphasis added). Similarly, in *In re Miamisburg Train Derailment Litigation*, the Ohio Court of Appeals concluded that punitive damages were inappropriate where a railroad company's compliance with applicable regulations concerning the retrofitting of reinforcing pads on a train "overwhelm[ed] any suggestion" that the defendant acted with disregard for safety. 132 Ohio App. 3d at 591.

As in *Clark* and *In re Miamisburg*, DuPont's conduct showed "[]respect for the law." 436 F.3d at 605. It is undisputed that DuPont complied with applicable regulations and notified

the relevant governmental bodies regarding its C8 emissions. *See, e.g.,* June 3, 2016 Trial Tr. at 184:23-185:2, 286:1-2; June 6, 2016 Trial Tr. at 171:4- 171:20; June 3, 2016 Trial Tr. 184:23- 185:3 (Dr. Siegel: "That's correct. I'm not claiming that there was any violation of a legal statute. I'm talking about a violation of public health principles, public health duty of care"); June 14, 2016 Trial Tr. at 286:2-4. Further, in contrast to *Clark*, where Chrysler declined to conduct tests in the face of a "good faith" dispute over the utility of the tests, here DuPont took measures to protect its employees and the community. Dr. Siegel repeatedly lauded DuPont for implementing "pretty strong measures to protect their own employees from exposure." *See, e.g.,* June 2, 2016 Trial Tr. at 163:14-16, 158: 12-13 ("what we're seeing is very good public health practice"); June 3, 2016 Trial Tr. at 181:20-182:14, 260:25-261:2 ("DuPont acted very, very admirably with respect to protecting its [] employees"); June 14, 2016 Trial Tr. at 199:9-10; June 15, 2016 Trial Tr. at 23:16-22. Dr. Siegel also acknowledged that DuPont was the *only* company to set community exposure guidelines. June 6, 2016 Trial Tr. at 75:24-77:9, 79:6-80:2 (DuPont's community exposure guidelines were set at a "reasonable level"), 187:19-22. Dr. Siegel even lauded DuPont for working with regulatory agencies to evaluate and control C8 exposures. *See* June 3, 2016 Trial Tr. at 126:10-25, 127:24-128:9, 170:2-171:11; June 6, 2016 Trial Tr. at 88:1-6 ("Absolutely. There were a large number of communications [with the government], yes"), 183:16-22 (agreeing DuPont was taking "steps … to reduce exposure in the community" including air scrubbers); June 14, 2016 Trial Tr. at 251:5-9.

DuPont's efforts to mitigate the potential impact of C8 on the community overwhelmingly establish that its conduct was not reprehensible as required to justify punitive damages. *See Exxon Valdez v. Exxon Mobile Corp.*, 490 F.3d 1066, 1088-89 (9th Cir. 2007), *vacated on other grounds*, 554 U.S. 471 (2008). In *Exxon Valdez*, the Ninth Circuit concluded

that a punitive damages award was unjustified as excessive where the corporation's conduct was found to be reckless, *but* the corporation had made significant remediation efforts, including voluntary payments to plaintiffs and prompt cleanup efforts. *Id*. The Ninth Circuit reasoned that "[i]n assessing reprehensibility for purposes of punitive damages, courts must not only take into account the reprehensibility of the original misconduct but also take into account *what has been done to mitigate the harm that the misconduct caused*. Mitigation is to be considered in order to encourage socially beneficial behavior." *Id*. (emphasis added); *see also Bains LLC v. ARCO Prods. Co*., 220 F. Supp. 2d 1193, 1199 (W.D. Wash. 2002) (failure to mitigate harm denotes a higher degree of responsibility).

Here, DuPont took considerable efforts to reduce C8 emissions and compensate the community making an award of punitive damages in any amount improper as a matter of law. DuPont designed, installed, operated and maintained state-of-the art water filtration plants for each of the six water districts close to the Washington Works plant. *See* July 7, 2016 Trial Tr. at 89:18-91:24. DuPont also funded the "Science Panel" to study and evaluate whether a "Probable Link" exists between C8 exposure and any human disease, and it agreed not to contest General Causation in future personal injury actions by class members involving "Probable Link Conditions" identified by the Science Panel—all *without* knowing what the ultimate cost or outcome would be. *See id.* at 91:25-94:3. DuPont also committed to pay up to $235 million for medical monitoring of Class Members for any "Probable Link Conditions" identified by the Science Panel. *Id.* at 94:4-94:13. And DuPont made a settlement payment of approximately $70 million to fund further health studies. *Id.* at 94:14-20.

Plaintiff's attorneys even publicly lauded DuPont's conduct, praising DuPont for accepting "Personal responsibility" and being "a good corporate citizen":

> Personal responsibility. The fundamental justice of this settlement
> may be that the company that put C-8 in the public drinking
> water … is now paying for the project that will determine for
> science, the courts, and the public, whether or not C-8 harms
> humans.… With all due respect to its initial error of judgment, ***at
> this point we must give deference to DuPont for stepping up to
> the plate and doing its part to take corporate personal
> responsibility*** for its C-8 contamination and the resulting impact on
> the persons residing in the six affected water districts who
> comprise the class action for this litigation. As to those people,
> ***DuPont appears to be taking action to right its wrong and accept
> responsibility as a good corporate citizen***.  (July 7, 2016 Trial Tr.
> 141:4-20; Ex. D.2979) (emphasis added).

This extraordinary praise from the law firm for the class plaintiffs makes clear that DuPont's
conduct was ***not*** reprehensible because DuPont accepted responsibility for prior conduct and
took meaningful steps toward abatement and compensation.

Beyond this, DuPont volunteered to participate in the EPA's 2010/2015 PFOA
Stewardship Program.  *Id.* at 99:17-24, 100:18-22.  By the end of 2006, four years ahead of
schedule (and well before the Science Panel issued its reports), DuPont had already reached its
goal of reducing C8 emissions by 95%.  *Id.* at 103:6-8; 108:25-109:2.  DuPont also initiated its
own internal program in 2007 to no longer make, use or buy C8.  *Id.* at 106:16-107:8.  And
DuPont *completely* eliminated C8 from its fluoropolymer manufacturing process in 2013.  *Id.* at
100:18-22.

Because DuPont acted "promptly and comprehensively to ameliorate" the alleged harm
caused to the community by C8 emissions, DuPont's conduct comes nowhere close to the level
of reprehensibility required for punitive damages.  *Valdez*, 490 F.3d at 1084.  DuPont's conduct
in following applicable laws and regulations, protecting employees (who would be exposed to
higher levels of C8 than the general community members), setting conservative C8 exposure
guidelines for its workers and the community, communicating with regulators regarding an

unregulated chemical, its settlement and vast mitigation efforts simply do *not* reflect reprehensible conduct, and the punitive damages award is inappropriate as a matter of law.

## II.     The Court Should Grant a New Trial For Numerous Reasons

Under Rule 59, a new trial should be ordered where the verdict "is against the weight of the evidence," the "damages are excessive," or "the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).  Where an evidentiary error "so altered the total mix of information submitted to the jury that it was substantially likely to have affected the verdict," the jury verdict should be vacated.  *Stockman v. Oakcrest Dental Ctr., P.C.,* 480 F.3d 791, 804 (6th Cir. 2007) (citations omitted) (remanding for new trial where improper admission of prejudicial settlement letters were substantially likely to have affected the verdict); *Mike's Train House, Inc. v. Lionel LLC*, 472 F.3d 398, 409-10 (6th Cir. 2006) (remanding for new trial where improper admission of expert's testimony under *Daubert* "likely had a substantial effect on the verdict").  Thus, courts order new trials in a wide range of circumstances, including (but not limited to) where there were erroneous jury instructions, erroneous and prejudicial evidentiary rulings, or any other trial errors that caused undue prejudice to the moving party.  *See Stockman*, 480 F.3d at 799 ("By 'prejudice,' we mean a substantial risk that the jury made a determination of liability on an improper basis.").[9]

### A.     The Court's Erroneous Interpretation of the *Leach* Agreement Constitutes a Threshold Error that Pervasively Affected the Trial

This Court's erroneous interpretation of the *Leach* Agreement infected every part of the trial, requiring a new trial on liability and damages.  The parties have extensively briefed the issue of the proper interpretation of the *Leach* Agreement, and DuPont recognizes that the Court

---

[9] Rather than repeat the arguments, DuPont incorporates by reference its prior briefing and arguments above with respect to Rule 50(a) and (b) in connection with its Rule 59 argument.  In other words, if the Court determines that these arguments do not support judgment as a matter of law, at a minimum they support a new trial.

has issued prior rulings on that subject.  DuPont incorporates by reference all of its prior briefing here (including, but not limited to, ECF Nos. 1031, 1032, 2813, 2816, 3560, 3563, and Bartlett No. 151), and preserves all of its arguments related to the proper interpretation of that agreement. DuPont focuses here on the impact of the Court's rulings during the course of the trial.

In toxic tort cases, as in the *Leach* Agreement, general causation asks whether the chemical is capable of causing the disease.  Specific causation similarly requires expert testimony on where the plaintiff fits within epidemiological studies and what those studies say about the likelihood of causation and amount of increased risk at the plaintiff's specific dose level.  *See Terry v. Caputo*, 875 N.E.2d 72, 76-77 (Ohio 2007).  This Court erred by excluding DuPont's specific causation testimony about Plaintiff's individual level of exposure and the amount of increased or decreased risk from such an exposure.  Similarly, this Court erred by transforming the "Probable Link" definition into a broad concession covering much of specific causation, and by focusing on 0.05 parts per billion when the Science Panel never determined that 0.05 ppb was capable of causing cancer and actually found that risk varies widely based on exposure levels.

This Court should have instructed the jury that based on a prior agreement between the parties, DuPont would not contest general causation—*i.e.,* that C8 is capable of causing testicular cancer, without additionally referring to the 0.05 ppb level.  This level was merely the lowest limit that could be detected by analytical chemistry at the time and one of the criteria for class membership.  There is nothing in the *Leach* Agreement that directs the work of the Science Panel based on this level, nor does the *Leach* Agreement require that the Science Panel findings be based on links to disease at the limits of C8 detection.  Assuming without conceding that the instructions required reference to the Science Panel, those instructions should have been precise

31

and complete.  In particular, as reflected in the instructions proposed by DuPont, the Court should have instructed: (a) the parties agreed to jointly appoint a three member Science Panel to study the Ohio Valley community and determine whether there was a "probable link" between exposure to C8 and any human disease; (b) the standard for "probable link" was defined by the parties as "more likely than not" that PFOA exposure among class members is linked to a human disease, which was a lower threshold than a finding of medical causation; (c) this "probable link" finding does not mean that the Science Panel concluded that PFOA exposure has caused any individual's disease nor does it mean that DuPont caused Mr. Freeman's testicular cancer.  *See* ECF No. 4559.  Similarly, a correct instruction on the Science Panel's report would have explained that the panel found specific increases (or decreases) in the risk of testicular cancer based on the level of C8 exposure in large populations.

There is a world of difference between saying there is a Probable Link in a large population at higher levels of exposure and saying that C8 "causes cancer," while barring all testimony about Mr. Freeman's actual amount of decreased or increased risk based on his specific exposure. June 24, 2016 Trial Tr. at 82:13-21; July 7, 2016 Trial Tr. at 33:16-19; June 1, 2016 Trial Tr. at 138:5-139:23.  Similarly, this Court erred by holding that the dosage level that might cause testicular cancer is a general causation issue, when that is plainly a matter of specific causation.  *See Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 677 (6th Cir. 2011) ("level of exposure" is an issue of specific causation).

This Court's rulings on the *Leach* Agreement all but eliminated DuPont's specific causation defense.  It rejected DuPont's substantive theories before trial.  DMO 5, ECF No. 67 at 4.  It then used those rulings to find that Dr. Bahnson was entitled to *assume* that C8 was a specific cause of Mr. Freeman's disease without assessing the impact of his specific dose under

the Science Panel's actual studies. EMO 4, ECF No. 66 at 15-17. More importantly, the Court refused to allow DuPont to show that Mr. Freeman's increased risk due to C8 was incredibly small—and in fact under the Science Panel's analysis he had a decreased risk of cancer. Yet it barred Dr. Rickard from testifying about "what the Science Panel actually analyzed." June 28, 2016 Trial Tr. at 15:7-11. The Court refused to allow the jury to see the Science Panel's report, or the supporting papers, which explains that different levels of exposure yield very different risks. *Id*. at 16, 20-21; June 7, 2016 Trial Tr. at 175-176. It also excluded DuPont's experts from testifying that Mr. Freeman's amount of exposure could not have caused his testicular cancer. June 28, 2016 Trial Tr. at 23:6-10. It stopped DuPont from showing that no cancer rating organization has classified C8 as a likely human carcinogen. *Id*. at 19:7-16. In short, the Court foreclosed any meaningful discussion of the science underlying Plaintiff's claims to have been injured by C8. June 7, 2016 Trial Tr. at 160-161.

These rulings also prejudiced DuPont's defense by allowing Mr. Freeman to tell the jury that the Science Panel found that C8 "causes cancer." June 1, 2016 Trial Tr. at 138:21-22. Plaintiff's counsel were allowed to repeat the untrue and scientifically unsupported mantra: "remember it's .05 is all it takes for a year." June 7, 2016 Trial Tr. at 128:15-17 ("We know C8 when consumed in these amounts for that period of time cause[s] testicular cancer.") June 1, 2016 Trial Tr. at 138:5-7. Mr. Freeman's counsel dismissed specific causation as nothing but "just the logistics" because DuPont was not allowed to introduce its evidence on that subject. *Id*. at 139:7-11. Counsel stated that: "Not everybody exposed is going to get cancer. But when they do, we sure do know why," *id*. at 163:12-13. But we don't know why in 85% of the cases and Plaintiff's expert could not exclude such possibilities. In the end, this Court also allowed Plaintiff's experts to wholly misstate the Science Panel's conclusions in its reports and studies,

saying that "the C8 panel has concluded that C8 causes testicular cancer."  June 3, 2016 Trial Tr. at 108:2-4.

Specific causation should not be a rhetorical question – it is a key defense that DuPont reserved in the *Leach* Agreement.  This Court should grant a new trial based on the severe unfair prejudice to DuPont at trial from this Court's erroneous interpretation of the *Leach* Agreement, and the evidentiary decisions that flowed from that interpretation.

### B. Improper Expert Testimony From Dr. Siegel and Mr. Petty Unfairly Prejudiced DuPont And Requires A New Trial

This Court should also grant a new trial based on the improper testimony from Dr. Siegel and Mr. Petty about "duty of care."  Ohio law requires the jury to decide whether DuPont owed a "duty of care" and then if DuPont breached that duty by failing to use "the care a reasonably prudent corporation would use in similar circumstances." *Menifee v. Ohio Welding Products, Inc.*, 472 N.E.2d 707, 710 (Ohio 1984). When experts testify about legal standards, they "invad[e] the province of the court to determine the applicable law and instruct the jury as to that law." *Torres v. County of Oakland*, 758 F.2d 147, 150-51 (6th Cir. 1985); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) ("It is the responsibility of the court, not testifying witnesses, to define legal terms.").  Thus, expert testimony that "attempts to tell the jury what result to reach and which runs the risk of interfering with a district court's jury instructions hardly can be viewed as being helpful to the jury." *Woods v. Lecureux*, 110 F.3d 1215, 1220-21 (6th Cir. 1997).

This Court recognized before trial that such testimony is improper, explaining that "legal" terms such as "duty of care, negligence, breach" are not "words the witnesses should be using" because they "are conclusions that the jury either does or doesn't draw." 5/6/16 MIL Hearing Tr., ECF No. 4527 PageID# 98349-50.  Unfortunately, this Court reversed course during trial and allowed Dr. Siegel to couch his testimony in terms of the "duty of care" even though

34

that was the question to be posed to the jury.  June 2, 2016 Trial Tr. at 39:6-42:11, 86:2-15, 222:1-23.   Further muddying the waters, this Court gave the jury confusing, off-the-cuff instructions that they could "consider if [DuPont] violated" the expert's standards, "but those standards don't become the law that you're going to apply."  June 10, 2016 Trial Tr. at 146-147. The Sixth Circuit forbids experts from using "terms" that have a "meaning in the law different" from the expert's meaning.  *Torres*, 758 F.2d at 150-51; *United States v. Barile*, 286 F.3d 749, 760-761 (4th Cir. 2002) (same).   Yet this Court acknowledged that the experts were doing exactly that.

As a result of this Court's ruling, Dr. Siegel testified dozens of times that "DuPont violated the public health duty of care."  *See, e.g.,* June 2, 2016 Trial Tr. at 157:7-8, 196:14-22, 221:14-222:4, 224:16-23; June 3, 2016 Trial Tr. at 91:16-92:17, 96:23-24, 98:4-6; June 6, 2016 Trial Tr. at 32:20-21, 169:17-20, 215:20-216:5, 257:3-7.   Repeated habitually throughout his testimony, it was often shortened to state say that "DuPont was violating its duty of care." June 3, 2016 Trial Tr. at 95:2-4; June 2, 2016 Trial Tr. at 75:16-76:3 ("they were not following the duty of care") & 198:14-21 ("DuPont was not following the duty of care").  Mr. Petty was no better.  After this Court told Plaintiff's counsel to stay away from the word "duty" with Mr. Petty, June 10, 2016 Trial Tr. at 146:6-147:22, those attorneys instead turned to an aspirational "duty" discussed in a DuPont document and used that to get the same type of misleading and improper testimony before the jury.  *See id.* at 172:10-25, 174-176, 251-254, 260:16-20, 264-268, 270-271; June 13, 2016 Trial Tr. at 32:2-5, 194:21-195:3.  They certainly understood the power of the word "duty" and the likelihood for the effect on the jurors.

Not only did this testimony confuse the jury about the correct legal standard in this case, but this Court also improperly allowed the experts to present "inadmissible personal value

judgments regarding the defendants' corporate conduct" as expert testimony in the guise of the precautionary principle and the public health "duty of care." *In re Welding Fume Prods. Liab. Litig.*, 2010 U.S. Dist. LEXIS 146067, *146 (N.D. Ohio June 4, 2010). That court explained that "the critical question for the jury in this case is whether the defendant corporations did what the law required them to do, not whether, from a societal perspective, they did what an 'ethical corporation' should have done." *In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164, *86 (N.D. Ohio Aug. 8, 2005). Allowing Dr. Siegel and Mr. Petty to use legal terms like "violation" and "duty" pervasively through seven days of testimony was incredibly confusing when, as explained above, they were making essentially moral and ethical judgments.

The pervasive nature of this improper testimony from Mr. Freeman's expert witnesses, who testified on *seven* out of the eleven days trial days he had to present his case, requires a new trial.

**C.     The Expert Testimony Introduced and Excluded at Trial Necessitates a New Trial**

For the reasons discussed more fully above, in pre-trial motion in *limine* briefing, and incorporated here by reference, the testimony presented by Plaintiff's experts regarding differential diagnosis, the idiopathic nature of testicular cancer, and causation violates *Daubert* and should not have been admitted. Likewise, the Court improperly excluded expert testimony from defense experts on these subjects.

Among other issues, this Court erred by excluding Dr. Rickard's opinions on the animal studies, the mechanism for causing testicular cancer, and the epidemiological studies. 5/12/16 EMO No. 5, *Freeman* ECF 69 at 10-12. It also improperly excluded the specific causation testimony of Dr. Luongo and Dr. Schoenberg that testicular cancer is idiopathic, that there is no basis to conclude that Mr. Freeman's cancer was caused by his C8 exposure, and that the cancer

36

was probably not caused by C8.  *Id*. at 19-25.  This Court also precluded DuPont's experts from discussing quartiles or any other issues regarding the Science Report.  5/6/16 MIL Hearing, ECF No. 4527 at 35-39, 44-46, 106-07; 5/18/16 MIL Order, *Freeman* ECF No. 70.  It also maintained its previous positions from *Bartlett* and the MDL on excluding the other opinions of DuPont's experts.  5/12/16 EMO No. 5, *Freeman* ECF 69 at 8-9.  Such errors warrant a new trial.

> **D.**   **Plaintiff's Repeated Assertion and Ultimate Withdrawal of His C8 Based Cancerphobia Theory Unduly Prejudiced DuPont By Allowing Introduction of Irrelevant and Unrebutted Evidence and Argument**

Throughout trial, Plaintiff offered shifting and inconsistent factual bases for his cancerphobia damages theory, withdrawing and reasserting a C8 related cancerphobia claim multiple times to introduce evidence in support of that claim and then to foreclose DuPont from introducing any evidence in rebuttal.  This was highly prejudicial.

At the outset of trial, in his opening statement, counsel for Plaintiff told the jury that Mr. Freeman has "anxiety and fears" because he has "C8 coursing through his blood right now," comparing it to a "mugger . . . still living in the neighborhood down the block and you don't know if he's going to come back and mug you again."  June 1, 2016 Trial Tr. at 148:2-149:7. Yet following the first week of trial, after his own expert witness volunteered testimony regarding the EPA's 2016 Drinking Water Health Advisory for PFOA (C8), and in an effort to close the door on further evidence about the Health Advisory, Plaintiff represented in a weekend email to the Court that DuPont had "very well established that the C8 is no longer in Mr. Freeman's body because the clearance rate would put it out of his body within 10 years" and therefore "[his] sole future cancerphobia claims relate to Mr. Freeman's risk for cancer as a result of his prior orchiectomy (testicle excision) and as a result of his radiation exposure through his CT-scanning surveillance protocol[.]"  *See* June 4, 2016 David Butler email to Court (attached "FW: Issue to raise w/ Judge Sargus").

Two days later, during the morning conference in chambers, Plaintiff's counsel confirmed that Plaintiff had *expressly abandoned* any cancerphobia claims related to the presence of any C8 in his blood: "Let me just make sure our position is clear.  We are not pursuing a cancerphobia claim based on biopersistence or C8 continued exposure in the blood. Our cancerphobia claim is limited solely to x-ray and CAT scan radiation exposure."  With that confirmation, counsel further agreed that Plaintiff "ha[s] no issue with the jury being instructed that there is no claim for cancerphobia based on biopersistence or C8 in the blood."  June 6, 2016 Trial Tr. at 3:5-5:9.

When DuPont asked for the agreed instruction during trial, however, Plaintiff recanted his prior concession without explanation and purported to "clarif[y]" that Mr. Freeman did intend to pursue a cancerphobia claim based on the presence of C8 in his blood, but only from 2005 to 2015.  *See id.* at 135:13-138:9.  The Court thus instructed the jury that they should not consider Plaintiff's future claim for cancerphobia due to the presence of C8 in his blood but that they should consider it for the years before 2015.  *Id.* at 137:3-138:8.

At the close of his case, Plaintiff opposed DuPont's motion for directed verdict on cancerphobia, advancing the argument that Plaintiff's cancerphobia claim had three aspects, including an alleged fear based on the continued presence of C8 in his blood without any limitation as to time.  *See* ECF 4570 at PAGEID#100013 n.4 (Opposition to DuPont's directed verdict motion: "development of a future cancer as a result of C8" is one of three aspects of Plaintiff's cancerphobia claim).  The Court denied DuPont's directed verdict motion as to cancerphobia.

Finally, in DuPont's own case, when DuPont attempted to introduce rebuttal evidence to show the fallacy of Plaintiff's C8 based cancerphobia theory, Plaintiff changed course yet again,

fully and expressly abandoning his C8 based cancerphobia claim for a *second* time during the final week of trial.  *See* June 28, 2016 Trial Tr. at 9:13-14 ("We are going to withdraw any claim for C8 exposure causing any cancerphobia.").

These court-sanctioned flip-flops on the basis for Plaintiff's cancerphobia claim severely and unduly prejudiced DuPont as the testimony surrounding the abandoned cancerphobia claim undoubtedly confused jurors as to the compensable damages Plaintiff was seeking and the evidence actually relevant to Plaintiff's remaining claims.   For example, after Plaintiff "reinstated" his claim for C8 based cancerphobia (before it was finally withdrawn), the jury heard the following testimony:

- During his direct examination, Mr. Freeman repeatedly testified that he had a fear of cancer until 2015 because of the purported C8 in his blood.  June 17, 2016 Trial Tr. at 150:11-151:13 ("[Q.] [D]id you have, sir, fear of cancer at that point in time up until, say, 2015 of getting additional diseases -- I mean, getting cancer again, sorry, with respect to your -- the fact that C8 was still in your blood? A. Oh, yes"; "I knew that I still had C8 in my blood"); *id.* at 151:16-19 ("Q. So -- and this was with respect to the fact that you had C8 and you had prior testicular cancer at that time, you knew you were at an increased risk for another cancer?  A. Correct."); *id.* at 151:20-152:4 ("Q. And in 2012 you've heard talk about the Science Panel finding 2012 at the time that DuPont says they were shocked to find out that it caused testicular cancer. Sir, did that heighten your fear, stay the same or decrease your fear when you heard about the 2012 Science Panel finding connecting C8 with testicular cancer, in particular? A. Well, it certainly was -- it was upsetting because now I knew that that, in fact in my mind, was why I had the testicular cancer so that heightened my concern about possible recurrence for me…."); *id.* at 152:23-153:4 ("Q. Were you aware during this period of time 2000 to 2015 that you, in fact, were at an increased statistical likelihood of developing cancer as a result of . . . your exposure to C8. . . in that period of time? A. I mean, all that taken together, yes, I certainly knew that I was -- had a higher probability of getting cancer again.")

- The Court allowed various post-injury evidence on the basis that it was relevant to Mr. Freeman's cancerphobia.  For example, over DuPont's objection urging its exclusion, the Court allowed witness testimony regarding an exhibit relating to a plant built after Mr. Freeman's tumor was removed because the Court found it went to cancerphobia in the 2005-2015 time period.  *See* June 13, 2016 Trial Tr. 235:10-237:1.

39

- And during argument on DuPont's Directed Verdict Motion, Plaintiff's counsel represented that "Dr. Bahnson's testimony, the record will reflect, was very clear on the statistical increase that Mr. Freeman now faces in a number of respects with regard to the C8 that is in his system and has been in his system[.]" *See* June 17, 2016 Trial Tr. at 227:2-9.

Despite DuPont's request, none of this evidence was stricken from the record and instead the jury was given another limiting instruction. *See* July 5, 2016 Trial Tr. at 3:16-25, 7:5-8:1 (jury instructed according to modified version of plaintiff's proposed instruction before closing arguments). (As outlined below at Part II.E, that instruction did not cure the prejudice to DuPont.) Moreover, DuPont had no full and fair opportunity to introduce rebuttal evidence, including but not limited to evidence concerning the 2016 EPA Drinking Water Health Advisory and other post-2012 scientific findings and studies regarding the statistical likelihood (or lack thereof) that C8 may cause cancer in humans. *See, e.g.*, June 27, 2016 Trial Tr. at 244:17-246:6; June 28, 2016 Trial Tr. at 4:4-10:9.

This undoubtedly compromised the jury's verdict as it allowed Plaintiff to sow juror confusion regarding the already-nebulous concept of cancerphobia and permissible damages. Further, as outlined at Part II.F, the jury was confused and misled into believing cancerphobia was a separate compensable claim rather than just one component of damages.

## E. The Court's Bifurcation Ruling and Malice Interrogatory Opened the Door to the Jury's Confused and Unsupported Damages Award

DuPont is also entitled to a new trial because the Court's bifurcation ruling allowed Plaintiff to introduce extensive evidence unrelated to compensatory liability and invited the jury to make a finding of malice without the proper context. The cumulative effect of these errors was that the jury was confused, resulting in in award of compensatory damages more than ten times the punitive damages (and greatly in excess of the proof at trial, *see* Part III).

To avert such a result, DuPont had requested in its Motion for Reconsideration on bifurcation (ECF 4400) that the Court "reconsider and revise the procedure followed during the *Bartlett* trial,"[10] so that instead "the trial of Mr. Freeman's claims [is] bifurcated into two phases, with the first phase limited to addressing the issue of liability for and amount of compensatory damages, and the second ... phase … addressing issues of liability for and any amount of punitive damages." *Id*. at PAGEID#93620, 93623. DuPont argued that otherwise "[t]he admission of evidence related to punitive liability and damages during the compensatory … phase would create a substantial risk of unfairly prejudicing DuPont and confusing the jury … particularly where the majority of the evidence related to punitive liability or damages is not relevant to Mr. Freeman's compensatory damages." *Id*. at PAGEID#93621. Specifically, such evidence included, *e.g.* "(i) events that occurred after Mr. Freeman's April 2000 diagnosis and successful treatment, (ii) communications to which he was not a party, (iii) statements from DuPont that he did not hear or see or rely upon, (iv) prior litigation that has nothing to do with his alleged exposure to C8, and (v) alleged violations of TSCA and RCRA that are irrelevant to his claimed injuries." *Id.* at PAGEID#93629.[11]

Instead of granting DuPont's request to have a different procedure than in *Bartlett* and to bifurcate the trial into compensatory and punitive phases, the Court denied this request and instead decided that "DuPont is entitled to a limiting instruction." DMO No. 17 at 9 [ECF 4549]. The Court ruled that post-2000 conduct was relevant to Mr. Freeman's cancerphobia theory of damages. *Id*. at 7-8 ("DuPont's post-2000 conduct of continuing to release C8 into Mr. Freeman's drinking water is evidence [he] may use to support his claim …."). It further ruled

---

[10] In *Bartlett*, as in this case, the Court instructed the jury on and presented it with an interrogatory asking the jury whether plaintiff had proved DuPont acted with malice. *See* DMO No. 17 at 3 [ECF 4549]; ECF 139.

[11] DuPont further argued that bifurcation was mandatory under Ohio substantive law that was enforceable in federal court under *Erie*, but the Court also rejected that argument. *See id*.; DMO No. 17 at 9-11.

that "knowing of town hall meetings related to C8, bottled water programs, studies, or complaints of violations of environmental law could support Mr. Freeman's burden of showing that his [cancerphobia] was reasonable." *Id*. at 8.

There are several reasons why the Court's bifurcation ruling warrants a new trial.

First, Mr. Freeman expressly abandoned his claim for C8 based cancerphobia (*see* Part II.D), even though that claim served as a prominent basis for the Court's bifurcation ruling. Indeed, Mr. Freeman clung to that claim despite much wavering and equivocating until the very end of the case—that is *after* he had already introduced extensive and ultimately irrelevant evidence that prejudiced DuPont, as further described above. In the end, all this evidence that would have been kept out but for Plaintiff's C8 cancerphobia claim was presented to the jury. Yet the Court denied DuPont's request to strike "all evidence, testimony and references to C8 related cancerphobia" after Plaintiff abandoned this claim (July 1, 2016 Trial Tr. at 4:23-24), and instead gave the jury another limiting instruction. *See id.* at 10:12; July 5, 2016 Trial Tr. at 3:16-25 ("I am inclined to give the plaintiff's version with some modification."); *id*. at 7:5-8:1 (instructing jury before closing arguments).

Second, even setting aside Mr. Freeman's abandonment of his C8 cancerphobia claim, the practical effect of trying the compensatory and punitive phases together was that Plaintiff was allowed to introduce extensive evidence relating solely to punitive damages that had nothing to do with his air emissions theory of C8 exposure. For example, Dr. Siegel and Mr. Petty testified at great length regarding C8 in ponds and landfills, as well as emissions into the Ohio River. *See, e.g.,* June 2, 2016 Trial Tr. at 81:3-9, 111:22-112:6 (Siegel agreeing with Plf.'s counsel DuPont should not have "dumped C-8 into the river that ended up in Mr. Freeman's blood"), 112:19-22; June 3, 2016 Trial Tr. at 23:2-7, 87:2-6, 90:21-23 (Siegel: "They knew

that … there [was] tremendous potential for exposure to the community from water emissions"), 94:1-3; June 6, 2016 Trial Tr. at 104:25-105:7 (Siegel: admitting Freeman does not claim C8 exposure from ponds or landfills), 243:10-22, 247:24-248:2; June 10, 2016 Trial Tr. at 181:25-24, 205:4-6; June 13, 2016 Trial Tr. at 21:3-22:9, 23:8-25:9, 63:15-11 (Petty: "if you put a material into a landfill, it always has the potential for leaking out -- right?"; "You don't want to store it into a landfill or put it somewhere, because it's just going to sit there for a long time."), 79:25-80:8, 98:1-17, 115:11-116:20, 117:8-118:17, 121:5-17, 167:213; June 15, 2016 Trial Tr. at 231:17-232:2.  But these had nothing to do with Mr. Freeman's alleged exposure to C8 in his drinking water from air emissions—his *only* theory of C8 exposure and the only theory on which he could recover damages.  Moreover, as explained in Part II.G, Plaintiff was also allowed to introduce evidence of communications to which he was not a party; DuPont statements he did not hear, see, or rely upon; prior litigation unrelated to his alleged exposure to C8; and alleged violations of TSCA and RCRA.

Third, the jury's verdict reflects that limiting instructions did not cure the unfair prejudice to DuPont.[12]  The complexity, number, and frequency of limiting instructions gave rise to "a significant danger that the jurors … misuse[d]" the mixed evidence combining compensatory and punitive liability.  *James v. Ruiz*, 111 A.3d 123, 142 (N.J. App. Div. 2015).

Although the Court gave variations of its DMO 17 limiting instruction myriad times over the course of the trial, the jury's $5.1 million compensatory award demonstrates that it was ultimately confused by the evidence before it and that it did not understand or heed the Court's limiting instructions.  The resulting juror confusion warrants a new trial.  *See, e.g., Benson v.*

---

[12] The Court's bifurcation order set out the following limiting instruction: "The Court will provide to the jury an instruction that it is to consider DuPont's pre-injury conduct in its determination of whether a reasonably prudent corporation would have foreseen that injury was likely to result to someone in Mr. Freeman's position, and DuPont's post-injury conduct is to be considered when determining (a) whether Mr. Freeman is entitled to emotional damages, and (b) the amount if any to which he is entitled, for his claimed cancerphobia claim."  DMO 17 at 9.

*Facemyer*, 2015 WL 5737340, at *19 (N.D. Ga. Sept. 30, 2015) ("The Court sought to address the claimed prejudicial effect on Defendant by giving appropriate limiting instructions, which the Court concludes may well have lead [sic] to jury confusion. This confusion, the Court concludes, warrants a new trial on damages."); *Pennington v. Sears, Roebuck & Co*., 878 P.2d 152, 155 (Colo. App. 1994) (reversing for new trial; "Even with the limiting instruction given by the trial court here . . . we can readily discern how this evidence would create prejudice and confuse the jury."); *see also James,* 111 A.3d at 142 ("there is a significant danger that the jurors will misuse that proof substantively in spite of a limiting instruction. We have serious doubts that most jurors in this particular context will be able to understand and follow an instruction that advises them to consider [*e.g.*] the absent radiologist's findings 'only for impeachment, but not for their substance.'"); *cf. United States v. Reyes*, 18 F.3d 65, 69 (2d Cir. 1994) ("[W]hen the likelihood is sufficiently high that the jury will not follow the limiting instructions, but will treat the evidence as proof of the truth of the declaration, the evidence is functionally indistinguishable from hearsay....").

Finally, without a clean bifurcation between compensatory and punitive evidence, the Court's one-question interrogatory on malice confused the jury into believing that it could take punitive damages into account in its compensatory award. DuPont respectfully submits that this anomalous instruction and interrogatory was the line where the bifurcation ruling crossed over from the realm of permissibility, as it should not have been presented to the jury without meaningfully explaining how they fit into the broader context of the *entire* trial. Otherwise, the lone interrogatory invited the jury to make a finding of malice without understanding that finding in its proper context. Indeed, the Court acknowledged that the jury was unaware it would have to return after rendering its verdict in the first phase of trial to assess the punitive damages award.

July 6, 2016 Trial Tr. at 13:1-25.  The effect of the instruction and interrogatory out of context was to increase the compensatory damages award.

The cumulative prejudice DuPont suffered from the bifurcation ruling and adherence to the *Bartlett* procedure outweighed the "convenience and economy" concerns animating the Court's rulings.  DMO 17 at 8; *see, e.g., Rotello v. Clayton Homes of Del., Inc*., 2006 WL 842931, at *1 (E.D. Tenn. Mar. 28, 2006) (rejecting efficiency arguments and ordering bifurcation because "a single trial including both liability for and amount of punitive damages would be unduly prejudicial to incorporated defendants and potentially confusing to the jury") (*citing Saxion v. Titan-C-Mfg., Inc*., 86 F.3d 553, 556 (6th Cir. 1996) and *In re Beverly Hills Fire Littig*., 695 F.2d 207, 216 (6th Cir. 1982)); *Chism v. CNH Am. LLC*, 2009 WL 890523, at *5 (E.D. Ark. Mar. 30, 2009), *aff'd*, 638 F.3d 637 (8th Cir. 2011) ("bifurcation of liability and compensatory damages issues from the punitive damages issue would prevent prejudice and comport with Arkansas law").  Indeed, the first phase of the *Freeman* trial lasted approximately 20 trial days over five weeks, but the second phase lasted less than one full day.  This confirms that Plaintiff introduced almost all of the punitive damage evidence during the first phase, to DuPont's extreme and unfair prejudice.

At bottom, DuPont is entitled to a new trial because the Court did not follow DuPont's proposal to cleanly divide the compensatory and punitive phases.  The Court's bifurcation structure decision confused the jury into believing they should take punitive damages into account in their compensatory award.

### F.     The Court Issued Improper Instructions on Causation and Cancerphobia

DuPont should also be granted a new trial because the Court's jury instructions on causation and cancerphobia were unfairly prejudicial, misleading, and when viewed "as a whole," these instructions failed to "adequately inform the jury of the relevant considerations and

45

provide a basis in law for aiding the jury in reaching its decision." *O-So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498, 502 (6th Cir. 1992) (internal quotation marks omitted).

*Causation.* The Court's jury instruction on proximate causation deviated from the Ohio pattern jury instructions and misstated the relevant law. The "substantial factor" language in the Court's jury instructions on proximate causation is not found in the relevant pattern instruction; by contrast, DuPont's proposed instruction regarding an act or failure to act that "directly produced" the injury followed the language of the relevant pattern instruction and Ohio law. *Compare* July 5, 2016 Trial Tr. at 241:9-14 ("Mr. Freeman must not only prove that DuPont was negligent, but also [that] such negligence was a proximate cause of his injur[ies]. Proximate cause is an act or failure to act that was a *substantial factor* in bringing about an injury and without which the injury would not have occurred.") (emphasis added) *with* 1-CV Ohio Jury Instructions § 405.01 (emphasis added) (defining a proximate cause as "an act or failure to act that in the natural and continuous sequence *directly produced* the [injury] and without which it would not have occurred."), *and* DuPont's Proposed Instruction No. 22 (Negligence – Proximate Cause), ECF No. 4582-1, at 28 ("Proximate cause is an act or failure to act that in the natural and continuous sequence *directly produced* the injury and without which it would not have occurred.") (emphasis added). By weakening the causal connection required under Ohio law, the Court failed to properly inform the jury of the law on negligence (compounding the misdirection the jury received from Plaintiff's experts, as described above). And indeed, the jury was confused about the meaning of proximate cause, as it specifically asked for further clarification on what "proximately" meant. *See* July 6, 2016 Trial Tr. at 8:16-19.

*Cancerphobia.* There also should not have been any separate instruction on cancerphobia. The Court already ruled that Mr. Freeman's alleged cancerphobia is not a separate

46

cause of action. DMO No. 14, R. 4458, at 96006. Under controlling case law cancerphobia is merely ***one of several factors*** a jury may consider in deciding the amount of compensatory damages, and not a separate and additional form of damages. *See Cantrell v. GAF Corp.*, 999 F.2d 1007, 1012 (6th Cir. 1993) (citing with approval jury instructions that stated that "no damages could be awarded for an increased risk of cancer," but that "the jury may award, as an element of compensatory or actual damages," damages for demonstrated fear of developing cancer) (emphasis added); *Lavelle v. Owens-Corning Fiberglas Corp.*, 30 Ohio Misc. 2d 11, 14-15 (Cuyahoga Cty. 1987) (plaintiffs can recover for cancerphobia as "mental distress damages," which have been characterized as a "normal *element* of damages available in a personal injury action in Ohio") (emphasis added); *Hagerty v. L & L Marine Servs., Inc.*, 788 F.2d 315, 317-18 (5th Cir. 1986) (stating that plaintiff was entitled to recover damages for "pain and suffering and mental anguish" and that the "present fear or anxiety due to the possibility of contracting cancer constitutes a present fact of mental anguish and may be included in recoverable damages"; "Cancerphobia is merely a specific type of mental anguish").

However, the jury instructions unduly emphasized Plaintiff's cancerphobia theories of recovery and improperly portrayed cancerphobia as a separate basis for damages—that is irreconcilable with Ohio law and this Court's decision granting summary judgment on the negligent infliction of emotional distress claim. *See* July 5, 2016 Trial Tr. at 243:22-244:12; DMO No. 14, R. 4458, at 96011. That separate instruction emphasizing Mr. Freeman's factual basis for cancerphobia invited the jury to award duplicative damages for pain and suffering. Further, the limiting instruction before closing arguments insufficiently clarified Mr. Freeman's abandonment of his C8 based cancerphobia theory, which was essential so the jury could know what to do with the evidence before it—especially given the previous instructions on the

permissible use of Plaintiff's C8 related cancerphobia claim. *See e.g.*, June 6, 2016 Trial Tr. 137:3-138:8. These errors—both individually and in the aggregate—were highly prejudicial, and were manifested in the excessive $5.1 million jury verdict.

      **G.**     **A New Trial Is Warranted Due to A Host Of Evidentiary Issues**

      A number of additional errors on important evidentiary issues[13] created an unfair playing field, cumulatively prejudiced DuPont, and require a new trial:

      **1.**    **Allowing questions on unseen documents.**  DuPont was prejudiced by the Court's decision to allow Plaintiff to cross-examine witnesses with documents they had never seen and issues outside the scope of direct. Fed. R. Evid. 602 states that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." This Court has held the same thing. Aug. 24, 2015 MIL Hearing Tr. at 240:11-13, 241:10-11 (interrogating witnesses about documents they never seen is "a problem"). In *Fambrough v. Wal-Mart Stores, Inc.*, 2015 U.S. App. LEXIS 7888 (6th Cir. May 11, 2015), the Sixth Circuit explained that that the presumption of personal knowledge of an organization's operations is exclusively limited to corporate officers, and does not extend to managers or supervisors. However, this Court ruled that any decision-maker must answer any question about documents they had not seen—resulting in the admission of documents unmoored to any knowledgeable witness. *See, e.g.,* June 22, 2016 Trial Tr. at 24:1 ("This is a Ph.D. decision maker at DuPont"); June 21, 2016 Trial Tr. at 237:16-17 ("the jury can know that this is a document that existed that DuPont was aware of"); June 24, 2016 Trial Tr. at 102:19-105:10 (reading into evidence the Little Hocking website, though witness had no knowledge of it).

      Similarly, the Court failed to limit the scope of cross-examination for DuPont employee witnesses who testified they consumed water at the plant, permitting almost unlimited cross-

---

[13] DuPont incorporates by reference all of the prior briefing and argument on these issues.

examination on documents they had not seen. *See, e.g.,* June 21, 2016 Trial Tr. at 196:12 (Playtis questioned regarding Little Hocking Water Association website and its communications with EPA, even though he testified "I've never visited this website"), 196-211, 217-233, 238-241; June 22, 2016 Trial Tr. at 75:16-76:14 (Playtis questioned regarding Dahlgren study he had never seen), 77:12-81:12, 155:20-23 (similar regarding P1.3399); June 23, 2016 Trial Tr. at 77:9-18 (Zipfel questioned regarding Reilly email to EPA even though stated "I've not seen this document" and "I'm telling you that I'm not aware of this document"), 105:5-107:14 (similar regarding email from DuPont employee in China to *other* DuPont employees: "Q. My question is simply do you see that? A. I see that, but I have not seen this document"); June 24, 2016 Trial Tr. at 53-67, 77:14-83:20, 88:25-91:13, 94:19-98:23, 127:21-130:14, 132:1-139:15, 140:14-146:15 (Jackson questioned regarding numerous DuPont documents, emails, and even Reilly personal emails she had not seen); *id.* at 62:17-19 ("Q. You're not amongst those people that are privy to this conversation taking place, right? A. That's correct"); *id.* at 149:10-150:24, 153:8-154:3 (Jackson questioned regarding studies and press releases *post-dating* her retirement from DuPont); June 30, 2016 Trial Tr. at 20:6-23:17 (Rickard questioned regarding DuPont employee email and memoranda he only saw at trial).

Indeed, the Court eventually allowed nearly unlimited cross-examination of DuPont employees or witnesses, regardless of whether they testified that they drank the water or not. *See, e.g.,* June 24, 2016 Trial Tr. at 253-256, 264-266, 267-273 (Hartten questioned regarding unseen DuPont documents, including historical documents from 1975, 1981-1982, and Reilly documents), 253:13-17 ("Q. …So you weren't aware that in 1975 they already had concerns, DuPont already had concerns, that Teflon was getting into the groundwater? A. No, sir. I was, I think, in junior high school at that time"); *id.* at 103:11-107:5, 122:11-125:10 (Flaherty

49

questioned regarding unseen internal DuPont documents and Reilly emails, even though he was not a DuPont employee).  This exceeded the permissible scope of cross-examination under Fed. R. Evid. 611(b) and was unfairly prejudicial.  Allowing such questions was wholly unfair when DuPont, for example, was not even allowed to use such documents to refresh a recollection about dates from its own witness.  June 23, 2016 Trial Tr. at 22-23.

        **2.**   **Discussion of the Leach class and the MDL.**  The Court erroneously permitted Plaintiff's counsel to discuss the *Leach* Agreement and the settlement class, which have no bearing on this "one plaintiff, one defendant" case.  June 16, 2016 Trial Tr. at 27:14-15; June 29, 2016 Trial Tr. at 80:4-7 ("And you know, sir, that in these six water districts, you know, sir, that 69,000 people have C8 in their bloodstream as a result of this pollution from the Washington Works facility, true?").  The Court refused to preclude such prejudicial references, and when counsel asked the Court to clarify to the jury that the case did not involve injury to other people, this Court essentially *sanctioned* DuPont for the request, improperly advising the jury that 3,500 other individuals had filed lawsuits against DuPont.  *See* June 29, 2016 Sealed Trial Tr. at 80-86 (86:5-8) ("I do want you to know there are 69,000 people who had water in these water districts with C8 in it from the DuPont Washington Works plant and that 3500 of them have filed lawsuits.").  Any relevance of this evidence was vastly outweighed by the extreme unfair prejudice to DuPont.

        Such evidence is routinely excluded by courts in this Circuit.  *See McLeod v. Parsons Corp.*, 73 F. App'x 846, 854 (6th Cir. 2003) (excluding evidence of other lawsuits to avoid prejudice and misleading the jury); *Sadler v. Advanced Bionics, LLC*, 2013 U.S. Dist. LEXIS 46637, at *10-11 (W.D. Ky. Apr. 1, 2013) ("evidence of the number of other lawsuits filed against [d]efendant should be excluded").  The unfair prejudice the Court created by

volunteering that 3,500 lawsuits had been filed against DuPont could not be overcome by the Court subsequently telling the jury to disregard it.

      **3.   Admitting the TSCA settlement consent order.**  This Court erred by admitting the settlement consent agreement under the Toxic Substances Control Act ("TSCA") *see Korn, Womack, Stern & Assocs. v. Fireman's Fund Ins. Co.*, 1994 U.S. App. LEXIS 15022, at *15-16 (6th Cir. June 15, 1994), which noted that evidence of a settlement "may have little relevance to the validity of the claim and may subvert the truth-finding goal of a trial." Thus, "[c]ourts agree that Rule 408 applies to civil consent decrees executed with government agencies." *N.J. Turnpike Auth. v. PPG Indus., Inc.*, 16 F. Supp. 2d 460, 473 (D.N.J. 1998). It further unfairly prejudiced DuPont by referring to it as "a substantial civil penalty" rather than a settlement agreement, and by allowing Mr. Freeman's expert to imply that the underlying actions involved an "unreasonable risk or substantial endangerment to human health." June 3, 2016 Trial Tr. at 71:17; *see also id.* at 48:14-52:19, 59:7-69:6, 70:9-71:19. That prejudice was exacerbated when this Court stopped DuPont from explaining the context of that order. *See, e.g.,* June 6, 2016 Trial Tr. at 163:3-165:14.

      **4.   Admitting the Reilly emails.**  This Court's decision to admit Mr. Reilly's personal emails was a serious error that unfairly prejudiced DuPont. The statements were personal speculations that were not made within the scope of his employment, and regarding issues he knew little or nothing about. *Mitroff v. Xomox Corp.*, 797 F.2d 271, 275 (6th Cir. 1986). As the Sixth Circuit explains, "[t]here is a critical difference between making a statement while one is an employee and having the actual or implied authority to make a statement on behalf of your employer." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999). These statements were accordingly not admissions against DuPont,

and instead constituted hearsay. While the emails were not relevant to Mr. Freeman's claims, they served an important role for Plaintiff's rhetorical argument regarding DuPont's state of mind. *See* July 5, 2016 Trial Tr. at 66:20-22 ("We poop in the river. We poop in the drinking water. And the bad news is that same poop ends up in people's blood. How sick is that?").

     **5. Allowing irrelevant opinions on class membership.** The Court erroneously permitted Mr. Freeman's expert Dr. MacIntosh to provide irrelevant class membership opinions that were beyond the scope of his expert disclosures and his expertise. Qualified experts may testify only on specified scientific issues that are relevant to the case. *See In re Welding Fume Prods. Liab. Litig.*, 2005 U.S. Dist. LEXIS 46164, at *35 (N.D. Ohio Aug. 8, 2005) ("the actual testimony [should] not exceed the scope of the expert's expertise"). Dr. MacIntosh's report and deposition testimony made clear that his only role in this case was to opine that Mr. Freeman is a member of the *Leach* class—an undisputed fact in this case. 12/15/15 Report of MacIntosh [ECF No. 4311, Ex. C] at 2; Tr. of 3/17/16 Depo. of MacIntosh [ECF No. 4398, Ex. B] at 40:13-18; DuPont's Motion *in Limine* to Exclude Irrelevant Opinions of David L. MacIntosh (MIL No. 6) [ECF No. 4446]. Over DuPont's objections, the Court permitted Dr. MacIntosh, an environmental consultant and professor, to opine about the relative toxicology of C8, the comparative levels of C8, and the current level of C8 in Freeman's body. *See* June 16, 2016 Trial Tr. at 46:18-49:12; 91:5-95:21; 108:24-110:10. This was outside of his expertise, undisclosed before trial, and did nothing but confuse the jury, waste time, and unfairly prejudice DuPont.

     **6. Excluding Dr. Cawley's testimony.** The Court also erred in excluding testimony from DuPont's treating physician, Dr. Cawley, that was highly probative to specific causation. *See* 5/19/16 MIL Order No. 8, *Freeman* ECF No. 71. She testified that when she began treating Mr. Freeman in 2000 there was no known cause of testicular cancer—that

testimony was directly probative of DuPont's knowledge at that time, as well as whether it is possible to distinguish Plaintiff's case of testicular cancer from any other case of testicular cancer that routinely occurs in patients across the country. Similarly, her testimony that she typically does not determine a cause of her patients' testicular cancer supports DuPont's position that the cause of testicular cancer is unknown in the majority of patients, even in Plaintiff's community, and that testicular cancer can and does occur with no known cause in Plaintiff's community. Finally, DuPont should have been allowed to show her testimony that rebuts Mr. Freeman's questions bolstering the Science Panel's findings through suggestions that C8 is a "generally accepted" cause of testicular cancer or that there is an accepted "strong causal connection" between C8 and testicular cancer in the medical and scientific community.

      **7. Excluding Mr. Freeman's role in the Emmet Study.** The Court erred by excluding evidence of and cross-examination regarding Mr. Freeman's role in the Emmett Study. The fact that Mr. Freeman played a significant "community liaison" role in a study regarding exposures to C8 in his community – a study that concluded that there was "no toxicity" from C8 at community levels of exposure, and which culminated in Mr. Freeman being listed as the coauthor of three peer-reviewed articles published in 2006 – bears directly on several critical issues, including: the state of scientific knowledge as it developed through time prior to the Science Panel's finding in 2012, how Mr. Freeman's knowledge compared to DuPont's knowledge prior to the Science Panel's findings, whether DuPont knew that harm was likely from community levels of exposure, whether DuPont's conduct was reasonable, and whether DuPont's conduct demonstrated actual malice toward Mr. Freeman and, if so, the degree of reprehensibility. The Court thus usurped the province of the jury, depriving the jurors their right to hear the full story and to weigh all of the evidence.

H.      **The Cumulative Effect of These Errors Warrants a New Trial**

DuPont respectfully submits that each of the above errors was individually significant enough to prevent the trial from being "fair to the party moving." *Montgomery Ward*, 311 U.S. at 251. At minimum, however, their cumulative effect warrants a new trial. "Since a jury reaches its verdict in light of the evidence as a whole, it makes no sense to try to analyze errors in artificial isolation, when deciding whether they were harmless." *Beck v. Haik*, 377 F.3d 624, 645 (6th Cir. 2004), overruled on other grounds by *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009); *see also Penn, LLC v. Prosper Bus. Dev. Corp.*, 600 Fed. Appx. 393, 402 (6th Cir. 2015) ("the cumulative effect of several erroneous rulings may constitute reversible error [even] where no single one would undermine our 'fair assurance' in the verdict") (citing *Beck*, 377 F.3d at 645).

In deciding whether evidentiary error is harmless, courts "begin with a presumption of prejudice" and the burden falls "on the beneficiary of the error" – here, Plaintiff – to show that "it is more probable than not that the jury would have reached the same verdict" absent the error. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464-65 (9th Cir. 2014) (en banc); *see also Schrand v. Federal Pacific Electric Co.*, 851 F.2d 152, 157 (6th Cir. 1988) ("If one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.") (quoting *Jordan v. Medley*, 711 F.2d 211, 218-19 (D.C. Cir. 1983) (Scalia, J.) (internal citation omitted)).

The beneficiary of an error faces a heavy burden where, as here, the erroneously admitted evidence was crucial to the party's case. *See Estate of Barabin*, 740 F.3d at 465 ("there is no doubt the error was not harmless" where the claim depended upon erroneously admitted expert testimony). Indeed, "[p]rejudice is at its apex when the district court erroneously admits

54

evidence that is critical to the proponent's case." *Id.* Such was the case here. The cumulative

effect of the errors outlined above requires a new trial.

## III. In The Alternative, This Court Should Significantly Reduce The Amount Of Compensatory Damages And Vacate or Reduce The Award of Punitive Damages

### A. The Verdict Was Excessive Because Mr. Freeman's Evidence Did Not Support An Award Of $5.1 Million In Compensatory Damages

The $5.1 million compensatory damage award is grossly disproportionate to the harm Mr.

Freeman sustained and lies beyond "the maximum that the jury reasonably could find to be

compensatory for [his] loss." *Hartzler v. Licking County Humane Soc.*, 740 F. Supp. 470, 480-

481 (S.D. Ohio 1990) (reducing the compensatory damages by a factor of ten for excessiveness;

citation omitted). "When considering whether an award is so excessive, [courts] consider[] other

awards in other cases, as well as the nature and extent of the injuries." *Sterling v. Velsicol Chem.*

*Corp.*, 855 F.2d 1188, 1207 (6th Cir. 1988) (citations omitted); *cf. Gumbs v. Pueblo Int'l, Inc.*,

823 F.2d 768, 772 (3d Cir. 1987) ("'[A] district court should be alert to its responsibility to see

that jury awards do not extend beyond all reasonable bounds.'") (citation omitted). Plaintiffs

must demonstrate pain and suffering with specificity to justify large jury awards. *Rogers v.*

*Fischer Body Div.*, 739 F.2d 1102, 1108 (6th Cir. 1984) (reversing award because "plaintiff has

not demonstrated his mental distress with the specificity required"). The Supreme Court

similarly instructs that "genuine injury in this respect" can be shown "by one's conduct and

observed by others." *Carey v. Piphus*, 435 U.S. 247, 263-64 (1978).

The trial record does not support a multi-million dollar award for pain and suffering or

cancerphobia. Mr. Freeman's cancer was caught early, treated promptly, and successfully and

completely removed with out-patient surgery over sixteen years ago. June 7, 2016 Trial Tr. at

28:7-9, 52-65, 86:6-10, 185:10-14, 186:5-8. The entire episode, from his first suspicion through

the post-operative discharge on that outpatient surgery itself took less than two weeks. June 17,

2016 Trial Tr. at 65-90.  He was back at work before even one week had passed.  *Id*. at 90-91.  Plaintiff recovered extraordinarily well and has no remaining physical injury.  He experienced few negative symptoms immediately after surgery, and quickly resumed his aggressive exercise regimen, which included the PX90 program, Tae Bo, weightlifting, running races, and playing basketball with college students.  June 17, 2016 Trial Tr. at 61:7-12, 171:1-7, 174:8-175:10, 177:14-20, 179:14-180:3, 180:18-181:5, 181:20-182:2.  As explained above, Mr. Freeman also presented no evidence to support the reasonableness of his unspecific fear of redeveloping cancer.

Not only did he recover quickly and completely, Mr. Freeman's medical records show no lasting pain, anguish, or distress.  In June 2000, a month after his April 2000 surgery, he reported "zero" pain.  *See* Plf.'s Ex. 2.21.24; June 7, 2016 Trial Tr. at 210:20-211:10.  He continued to report no pain at follow-up appointments continuing for years, Plf.'s Ex. 2.21.12, and Dr. Bahnson confirmed that when he examined plaintiff in December 2015, plaintiff was still "healthy and not in any physical or emotional distress."  June 7, 2016 Trial Tr. at 184:22-24.  Given Mr. Freeman's successful outpatient procedure and recovery, and the paucity of his evidence on cancerphobia as discussed above, $5.1 million is an unreasonably high award.

The excessive nature of this award is demonstrated by the fact that the non-economic damages in this case far exceed those awarded in similar cases.  *Sterling*, 855 F.2d at 1207 ("this court considers other awards in other cases" to determine excessiveness).  DuPont is not aware of any Ohio court, state or federal, allowing such a large award to stand in a toxic exposure case where the plaintiff fully recovered.  *See Cooley v. Lincoln Elec. Co.*, 776 F. Supp. 2d 511, 519 (N.D. Ohio 2011) (award of $787,500 for permanent injuries including tremors, impotency, and depression based on exposure to welding consumables, where defendant failed to warn of known

56

risks); *Stewart v. Zone Cab of Cleveland*, 2003 Ohio 4067, P21-P22 (Ohio Ct. App. 2003) (finding $75,000 award for pain and suffering excessive because symptoms subsided less than two months after the accident and there was no permanent injury); *see also Immell v. Petron, Inc.*, 2015 Nat. Jury Verdict Review LEXIS 214 (Ohio 2015) (non-economic award of $600,000 for nausea, headaches, and emotional distress due to diesel fuel exposure).

Even the highest awards for pain and suffering that accompany permanent, disabling injuries or death do not approach five million dollars in Ohio courts. *See Decker v. GE Healthcare*, 2013 Jury Verdicts LEXIS 2444 (S.D. Ohio 2013) ($3,500,000 non-economic damages for painful and disabling terminal disease); *Fisher v. Beazer USA, Inc.*, 2013 Jury Verdicts LEXIS 1795 (Ohio 2013) ($1.3 million for permanent pain and suffering from asbestos exposure, later reduced on other grounds); *Sunnycalb v. CSX Trans., Inc*., 2012 Jury Verdicts LEXIS 18675 (Ohio 2012) ($610,000 for permanent pain-inducing condition from chemical exposure); *Battaglia v. Conrail*, 2009 Ohio 5505, ¶ 102 (Ohio App. 2009) (award of $2.6 million for asthma and a reduced lifespan after a twenty-year exposure to diesel exhaust).  The Sixth Circuit has significantly reduced large awards for even *ongoing* pain and suffering where there is little evidence that the pain is significant or disabling.  In *Sterling*, 855 F.2d at 1203, 1205, 1209, the Sixth Circuit reduced awards for cancerphobia for assorted plaintiffs from $250,000 to $18,000, from $250,000 to $27,000, and from $100,000 to $54,000, among others.  If this Court does not order a remittitur for the excessive award, it should order a new trial on compensatory damages on Mr. Freeman's claims.  *See Jackson v. A-C Prod. Liab. Trust*, 622 F. Supp. 2d 641, 647 (N.D. Ohio 2009) (granting a new trial and holding that $8 million for mesothelioma-related death "shocks the conscience" and is "beyond the range of awards for similar injuries in similar cases").

Another indication of the excessiveness of the $5.1 million verdict is the jury verdict in *Bartlett*, No. 2:13-cv-170 (S.D. Ohio).  Mrs. Bartlett had substantially similar facts about DuPont's actions, the same theories about warning the public, and relied on substantially the same exhibits and witnesses.  She reported significantly more pain over a longer time, and was bedridden for three months with a catheter.  Yet the jury in *Bartlett* awarded $1.1 million for pain and suffering on the negligence claim—only about 20% of the award in this case.

In assessing excessiveness, this Court should also consider the guidance from the Ohio legislature about the amounts of pain and suffering it considers reasonable under Ohio law for plaintiffs without a "permanent and substantial physical deformity."  O.R.C. § 2315.18(B)(2).  That amount is $250,000.  *Id.*  Even if this statute does not directly apply to this case (and DuPont preserves its argument that it does apply) it serves as a useful benchmark to evaluate the reasonableness of the pain and suffering award.  An award of *more than twenty times the maximum* allowed under the statute is certainly excessive.

The jury's $5.1 million non-economic damages award is excessive by any measure and should be vacated or substantially reduced.  DuPont respectfully suggests that a reasonable compensatory damages award is in the neighborhood of the $250,000 amount set by the Ohio General Assembly.

### B. This Court Should Reduce The Jury's Award Of Compensatory Damages To Comply With The Ohio Tort Reform Statute

This Court should apply Ohio's Tort Reform Act to reduce Mr. Freeman's damages because "Ohio law caps tort recoveries for non-economic losses at $250,000." *Mengelkamp v. Lake Metro. Hous. Auth.*, 549 Fed. Appx. 323, 334 (6th Cir. 2013).  This Court cannot enter judgment for an amount outside of "the confines set by state law."  *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 435 (1996) (citation omitted).  Ohio Rev. Code § 2315.18(B)(2)

58

limits compensatory damages for purely noneconomic damages to $250,000. Because Mr. Freeman did not assert any economic losses, *see* MIL Hearing Tr., ECF No. 4527 (May 6, 2016), at 18, this Court should reduce his award of compensatory damages to $250,000.

While this Court held that the Tort Reform Act does not apply to injuries that arose prior to the statute's effective date of April 7, 2005, *see* DMO No. 10, ECF No. 4215 at 1-7, DuPont respectfully requests reconsideration on that issue. The Ohio Supreme Court has held that new legislation applies prospectively to claims that accrue after the legislation's effective date. *Digital & Analog Design Corp. v. N. Supply Co.*, 590 N.E.2d 737, 743 (Ohio 1992) (legislation applies to "causes of action arising on or after … the effective date"); *Thorton v. Montville Plastics & Rubber, Inc.*, 902 N.E.2d 482, 486 (Ohio 2009) (date the claim arose determines which statute applies). The Sixth Circuit agrees. *Chesher v. Neyer*, 477 F.3d 784, 794 (6th Cir. 2007) (applying statute "to claims accruing after the effective date of the amendment"). A toxic exposure claim under Ohio law does not accrue under until a plaintiff could have reasonably discovered the cause of her injury. Section 2305.10(B)(1). This was an explicit legislative adoption of the discovery rule in toxic tort cases as implemented by the Ohio Supreme Court. *See Norgard v. Brush Wellman*, 766 N.E.2d 977, 979 (Ohio 2002).

Thus, the accrual date controls the analysis, not the date of the injury or negligence. *Ross v. Farmers Ins. Group of Cos.*, 1997 Ohio App. LEXIS 30, *8-9 (Ohio App. Jan. 10, 1997) ("the operative date for determining whether to apply 'former R.C. 3937.18' or the Savoie amendment … is not the accident date but the [accrual] date"); *Treese v. City of Delaware*, 642 N.E.2d 1147, 1151 (Ohio App. 1994) ("In this case, the cause of action accrued after the effective date … even though the alleged negligence occurred before the effective date."). While this Court previously relied on a distinction between the terms "arose" and "accrued," Section

2305.10 does not contain the words "arose" or "arise" anywhere.  Even if the words meant

something different under Ohio law (and they do not under *Browning v. Burt*, 613 N.E.2d 993,

1004 (Ohio 1993)), the legislature has clearly stated that the *accrual* date is all that matters.

*See* 1-17 Anderson's Ohio Consumer Law § 17.03 (criticizing this Court's reliance on that

distinction).

Mr. Freeman did not and could not know that C8 was capable of causing human testicular

cancer at community exposure levels until the Science Panel released its findings in 2012.  He

first learned about C8 in 2002, from television and a public meeting that "reassured" him and

"dismissed" any concerns he had about C8.  June 17, 2016 Trial Tr. at 122-125.  Mr. Freeman

had read studies online that he understood to "indicate[]" "a possibility" that C8 might cause

testicular cancer, but did not pursue the issue "beyond that there was no population data to

suggest anything."  Depo. Tr. of David C. Freeman, ECF No. 4312, Ex. D (June 11, 2014)

("Freeman Depo. Tr.") at 134-37.  He had "no further understanding or speculation as to if that

was the cause" of his cancer.  *Id.*  Indeed, he continued to receive information about C8 –

including the Emmett study in 2005-06 that found no toxicity – but summarized that "nothing I

saw made me concerned" about exposure at community exposure levels.  June 17, 2016 Trial Tr.

at 145:13.  He "had no reason to believe that … [DuPont employees] were not telling me the

truth as far as the potential harm of the chemical."  *Id*. at 146:2-6.

It was not until "August of 2005 or September" that Mr. Freeman learned information

that made him stop drinking the water and begin to worry that the water was not safe.  June 17,

2016 Trial Tr. at 148-49, 182-83.  Moreover, Mr. Freeman believes that the Science Panel's 2012

Report was what "established the probable link with [his] testicular cancer."  June 11, 2014

Freeman Depo. Tr. at 148:13-18.  Consistent with that belief, he did not contact an attorney until

*after* the Science Panel's Report, and had heard nothing about the *Leach* class action or any other litigation regarding C8.  *Id.* at 146-48.  Mr. Freeman's understanding is paralleled by both Dr. Rickard, who testified that "[t]here were no data prior to 2011 that demonstrated PFOA caused any disease in humans at community levels of exposure," Rickard Expert Report, ECF No. 4310, Ex. B, at 4, and Dr. Bahnson, who similarly testified to no knowledge that C8 could cause cancer before the Science Panel's report.  June 7, 2016 Trial Tr. at 40-41, 168-69.

Because Plaintiff did not and could not have known that C8 could cause human testicular cancer at community exposure levels prior to the Science Panel's report, Mr. Freeman's claims accrued after April 7, 2005.  This Court should therefore order a remittitur of the $5.1 compensatory damage award to $250,000 under the Ohio Tort Reform Act.

### C.    Punitive Damages Were Duplicative And Excessive In Light of the Compensatory Award For Emotional Distress.

The imposition of a separate, additional award of punitive damages was inappropriate as it was clear that the jury's compensatory award already included punitive damages.  This is so for two reasons.  First, under controlling precedent, a large compensatory damages award that includes damages for emotional distress strongly suggests that the award has a punitive component—making recovery of punitive damages duplicative.  Second, as explained at Part II.E, the jury's award of compensatory damages approximately ten times more than punitive damages shows it was confused by the bifurcation and various limiting instructions.

As U.S. Supreme Court and Sixth Circuit precedent establish, a separate award of punitive damages is unreasonable *and* duplicative where a large portion of a compensatory award is for emotional distress.  *See State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 426 (2002) ("In many cases in which compensatory damages include an amount for emotional distress … there is no clear line of demarcation between punishment and compensation[,] and a

61

verdict for a specified amount frequently includes elements of both") (internal citation and quotation marks omitted).  Following *Campbell,* the Sixth Circuit in *Bach v. First Union Nat'l Bank* held that a punitive damages award was unreasonably excessive, in part, because of "the fact that much of the compensatory damage award must be attributable to [Plaintiff's] pain and suffering.… This fact compels the conclusion that the punitive damage award is *duplicative*, and that either a new trial on punitive damages or a remittitur of the damages awarded is appropriate."  149 Fed. Appx. 354, 366 (6th Cir. 2005) (emphasis added).

There can be no serious doubt that the jury's compensatory award of $5.1 million was almost entirely for emotional distress, especially because Mr. Freeman claimed no other damages (and any moderate pain that he claimed was confined to less than a one-month time period).  *See, e.g*., July 1, 2016 Trial. Tr. at 60:22-61:5 (reflecting Mr. Freeman does not claim lost wages or medical expenses); Plf.'s Opp. MIL 2 [ECF 4482]; *see also* Plf.'s Ex. 2.21.24; June 7, 2016 Trial Tr. at 210:20-211:10.  As in *Campbell*, "the compensatory damages for the injury suffered here … likely were based on a component which was duplicated in the punitive award."  538 U.S. at 426.  Although DuPont requested a jury instruction to prevent any potential duplicative award, the Court denied that request.  *See* July 7, 2016 Trial Tr. 149:24-152:4.  As a result, remittitur of the punitive damages award in its entirety is appropriate because it is duplicative of the compensatory award.  *See Bach*, 149 Fed. Appx. at 366; *Campbell*, 538 U.S. at 426.

The punitive award is also duplicative and excessive because the compensatory award *already* afforded Plaintiff "substantial" damages.  In *Campbell,* the U.S. Supreme Court held that a $1 million compensatory award was "substantial" and "***complete compensation***" for plaintiffs' harm.  538 U.S. at 426 (emphasis added).  The court explained that this is so because "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages…."  *Id*.

62

at 419.  As such, an award of punitive damages on top of full and complete compensation reaches the limits of constitutional permissibility: "When compensatory damages are substantial, then [even] a lesser ratio [of punitive damages], perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  *Id.* at 425.  Thus, although the punitive damages the jury awarded here are less than the $5.1 million compensatory award, *Campbell* and *Bach* instruct that even such an award of punitive damages in this case would be excessive and unjustified in light of the significant compensatory damages and the near certain risk of a duplicative recovery.

DuPont should not be punished twice for the same conduct, and this Court should therefore vacate the punitive damages award in this case.

## <u>CONCLUSION</u>

For all of the foregoing reasons, DuPont respectfully requests that the Court enter judgment as a matter of law on Mr. Freeman's claim for negligence, his cancerphobia theory of damages, and his punitive damages claim.  Alternatively, DuPont requests that this Court grant a new trial or a remittitur consistent with Ohio law and federal constitutional constraints.

Respectfully submitted,

*/s/ Damond R. Mace*

| | |
|---|---|
| Pierre H. Bergeron (0071402) | Damond R. Mace (0017102) (Trial Attorney) |
| SQUIRE PATTON BOGGS (US) LLP | Stephen M. Fazio (0076873) |
| 221 E. Fourth Street | Stephanie E. Niehaus (0075511) |
| Suite 2900 | SQUIRE PATTON BOGGS (US) LLP |
| Cincinnati, Ohio 45202 | 4900 Key Tower |
| (513) 361-1200 (Phone) | 127 Public Square |
| (513) 361-1201 (Fax) | Cleveland, Ohio 44114 |
| | (216) 479-8500 (Phone) |
| | (216) 479-8780 (Fax) |

C. Craig Woods (0010732)
Aaron T. Brogdon (0081858)
2000 Huntington Center
41 South High Street
Columbus, Ohio 43215
(614) 365-2700 (Phone)
(614) 365-2499 (Fax)

*Attorneys for Defendant E. I. du Pont de Nemours and Company*

64

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and accurate copy of the foregoing was served on August 8, 2016, upon counsel of record, via this Court's electronic filing system.

/s/ *Damond R. Mace*
Damond R. Mace